**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**
        Plaintiff,

vs.

                                                  Cr. No. 13-3301 JAP

**ROBERT E. ADAMS,**
        Defendant.

**MEMORANDUM OPINION AND ORDER**

On February 10, 2014, Defendant Robert E. Adams filed a motion to suppress all the
evidence obtained through the execution of four search warrants, which were issued in January
2013. *See* DEFENDANT ROBERT E. ADAMS' MOTION TO SUPPRESS EVIDENCE OR, IN
THE ALTERNATIVE, TO HOLD A FRANKS HEARING, AND MEMORANDUM IN
SUPPORT THEREOF (Doc. No. 28) (Motion to Suppress).  These warrants authorized the
Government to search Defendant's home and business. The Government defends the validity of
the warrants on the basis that there was probable cause to believe Defendant was engaged in
firearms smuggling. *See* UNITED STATES'S AMENDED RESPONSE TO DEFENDANT
ROBERT E. ADAMS' MOTION TO SUPPRESS EVIDENCE (Doc. No. 32) (Response).

On March 14, 2014, the Court held a hearing on Defendant's motion, at which Norman
Cairns and Kimberly Brawley represented the Government and Nancy Holloway and Vincent
Ward represented Defendant, who was present. At this hearing, the Government reiterated its
position that Defendant did not produce sufficient evidence to warrant holding an evidentiary
hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). However, the Government chose, of its
own volition, to call two witnesses – the affiant Frank Ortiz and an investigator Theresa Duran –
to support its position. After a painstaking review of the evidence and the briefing, including
Defendant's reply, DEFENDANT ROBERT E. ADAMS' REPLY TO THE UNITED STATES'

AMENDED RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Doc. No. 34), the Court has reluctantly decided to deny Defendant's Motion to Suppress.

## BACKGROUND

In January 2013, Special Agent Frank Ortiz (SA Ortiz) prepared a 41-page warrant affidavit, which he used to secure four warrants to search Defendant's home and business properties. *See* January 2013 Warrants, Exhibits A-D to Motion to Suppress (Doc. Nos. 28-1 through 28-9). The warrant affidavit alleges that Defendant, a federal firearms licensee (FFL), violated firearms recordkeeping requirements, smuggled firearms into the United States, and evaded tax liability on his firearms activities in violation of federal law. Warrant Affidavit, Exhibit A to Motion to Suppress (Doc. Nos. 28-1 & 28-2). At the time SA Ortiz prepared the warrant affidavit, he was working for the New Mexico Attorney General's Office (NM AGO), Border Violence Division. *Id.* Introduction. However, as the affidavit indicates, prior to December 2011, SA Ortiz worked for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), where he was employed for "nearly 27 years." *Id.* In fact, SA Ortiz began his investigation of Defendant in 2011 while working as an ATF senior special agent in the criminal enforcement division. *Id.* ¶ 1.

At that time, SA Ortiz was assigned to review criminal enforcement referrals concerning Defendant, including at least one referral submitted by Industry Operations Investigator Theresa Duran (IOI Duran), an ATF investigator who participated in two ATF administrative inspections of Defendant's businesses, one in 2006 and one in 2009. *Id.*; Transcript of Hearing on Motion to Suppress (Doc. No. 38) (Transcript) at 13:23-14:3, 17:22-18:2, 117:16-23. The warrant affidavit begins by summarizing the results of these inspections. According SA Ortiz, these inspections revealed that Defendant was failing to keep proper records as required by federal law. Warrant

Affidavit ¶ 5. In addition, the inspections exposed Defendant's practice of purchasing firearms, transferring these firearms to his personal collection, and transferring them back to his business inventory only when a buyer surfaced. *Id.* ¶ 9.

The warrant further explains that Defendant initially possessed only one federal firearms license, an importer's license associated with his sole proprietorship, Robert E. Adams d/b/a/ Adams International. This was his only federal firearms license at the time of the 2006 administrative inspection. *Id.* However, between the 2006 and 2009 inspections, Defendant acquired two additional licenses for a total of three federal firearms licenses:

- Importer's License #5-85-001-08-0A-88219 for Robert E. Adams d/b/a Adams International;

- Importer's License #5-85-001-08-0K-00983 for SW LLC d/b/a Bob Adams, SW, Adams Guns; and

- Curio License # 5-85-001-03-0M-00982 for Bob Adams LLC.

*Id.* ¶ 1. According to the affidavit, Defendant relinquished the license associated with his sole proprietorship immediately prior to the 2009 inspection. *Id.* As a result, after September 2009, Defendant possessed only one importer's license, which was connected with his business SW LLC.

The remainder of the warrant affidavit focuses on Defendant's history of submitting ATF Form 6[1] applications to import firearms using SW LLC and the sequence of events surrounding a 2011 shipment of firearms Defendant purchased from a Canadian company called Bud Haynes & Company Auctioneers. In a nutshell, SA Ortiz became suspicious that Defendant was smuggling firearms into the United States because Defendant submitted numerous ATF Form 6 applications to import firearms that Defendant appeared not to have used. Transcript at 87:10-13. In addition,

---

[1] An ATF Form 6 is simply an application submitted by an FFL to obtain permission to import firearms into the United States. Transcript at 9:22-25.

SA Ortiz believed Defendant attempted to smuggle firearms purchased from Bud Haynes & Company into the country because Defendant secreted this shipment in a Canadian storage locker in violation of Canadian law without obtaining approval from ATF to import all of the firearms contained in the shipment. *Id.* at 166:16-167:3. While the affidavit provides other details concerning Defendant's travel history, firearms sales history, and tax history, the majority of the affidavit focuses on Defendant's recordkeeping and importation activities.

On January 23, 2013,[2] SA Ortiz and other law enforcement officials executed the search warrants seizing nearly 1600 firearms from Defendant's home and business properties. Motion to Suppress at 2. Most of these firearms have been returned to Defendant. Response at 10. However, officials also seized firearms paperwork during the search, including three Form 4457 documents.[3] *Id.* Defendant seeks to suppress both the unreturned firearms and the Form 4457 documents, which formed the basis for Defendant's subsequent indictment.

## DISCUSSION

### I.     Franks Violations

Defendant contends that the Court ought to suppress the evidence the Government seized during the January 2013 execution of the search warrants in accordance with *Franks v. Delaware*, 438 U.S. 154 (1978). Under *Franks*, a court must invalidate a search warrant and suppress evidence seized under the warrant if the "court (1) finds that the affiant knowingly or recklessly included false statements in or omitted material information from an affidavit in support of a search warrant and (2) concludes, after excising such false statements and

---

[2] This is the date of execution as shown on the warrant for SW LLC, Exhibit B to Motion to Suppress (Doc. No. 28-3) at 2.

[3] A Form 4457 is a customs document used to certify that items being brought into the United States were previously removed from the United States. The Form 4457 documents seized from Defendant's properties are filled out for firearms specifically. *See* MEMORANDUM OPINION AND ORDER (Doc. No. 33) at 2.

considering such material omissions, that the corrected affidavit does not support a finding of probable cause." *United States v. Garcia-Zambrano*, 530 F.3d 1249, 1254 (10th Cir. 2008). Because there is a presumption of a warrant's validity, Defendant bears the burden of proving that the affidavit contains knowing or reckless false statements that vitiate probable cause. *Franks*, 438 U.S. at 171; *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997).

### A. Knowing or Reckless False Statements

Defendant's motion to suppress discusses four instances of false, misleading, or omitted information. First, Defendant challenges the opening sentence of paragraph 13, which states:

> IO investigation determined that ADAMS is continuing to conduct business as he did in 2006, importing firearms under SW LLC, then transferring firearms to his personal collection and subsequently transferring them into his A&D dealer's record to transfer to other purchasers or FFLs, to avoid payment of excise taxes and ATF inspection.

Warrant Affidavit ¶ 13. According to Defendant, this statement incorrectly suggests that the affiant, SA Ortiz, had recently investigated Defendant's firearms business as of 2013, even though, it is undisputed that neither ATF nor SA Ortiz had reviewed Defendant's business records since late 2009.

The Court admits that it did not initially interpret this sentence in the same manner as Defendant. Because the sentence begins "IO investigation determined that," the Court had assumed the sentence's conclusions were based on the investigation of Defendant conducted by Industry Operations (IO), an investigation which ceased by early 2010. According to the warrant affidavit, the IO division of ATF conducted inspections of Defendant in 2006 and 2009. After the 2009 inspection, IOI Duran continued to monitor Defendant's activities through early 2010. *Id.* ¶¶ 1-12. There is no other reference to an IO investigation in the warrant affidavit. Indeed, at the hearing, SA Ortiz clarified that all IO inspection work ceased, at the latest, by early 2011 after the criminal ATF investigation commenced. Transcript at 112:2-9, 127:24-128:19.

However, at the March 14, 2014 hearing, SA Ortiz corroborated Defendant's reading of the above sentence. During cross-examination, SA Ortiz explained that the statement about Defendant's business practices represents his own assessment of Defendant's activities as of 2013. *Id.* at 125:7-14, 126:15-18. According to SA Ortiz, he based this assessment on his reading of IOI Duran's criminal enforcement referrals as well as his own investigation of Defendant, *id.*, which primarily consisted of reviewing ATF Form 6 applications submitted by Defendant, observing various websites where Defendant advertised firearms for sale, and tracking a 2011 shipment of firearms Defendant purchased from a Canadian auctioneer, *see generally id.* at 86-91. Finally, SA Ortiz specifically agreed that the part of paragraph 13 stating Defendant was continuing to import firearms under SW LLC was based, at least in part, on his own review of Defendant's history of submitting Form 6 applications between 2008 and 2011. *Id.* at 126:19-127:3.

SA Ortiz's explanation is perplexing. It seems strange that SA Ortiz would attribute his own opinions as of 2013 to IO, a department that is separate from both the criminal enforcement division of ATF where SA Ortiz once worked and from the NM AGO where SA Ortiz worked at the time he drafted the warrant affidavit. *Id.* at 111:4-11, 119:20-23. Nonetheless, the Court is not convinced that this sentence is misleading when read in the context of the entire warrant affidavit, an affidavit which details both the dates and the extent of the IO investigation. In other words, it is clear from a complete reading of the warrant affidavit that neither the affiant nor ATF reviewed any of Defendant's business records that may have been created after 2009. Therefore, because this sentence is neither false nor misleading, the Court will not excise the first sentence of paragraph 13.

Second, Defendant contends that SA Ortiz mislead the magistrate judges who reviewed the warrant affidavit by implying that the removal of importer's marks is a crime. Defendant pinpoints paragraph 6, which states: "During the September 2006 Compliance Inspection, ADAMS received an ATF violation under the purview of CFR 478.92(a) for 32 instances of removing the importer's marks on imported firearms." Warrant Affidavit ¶ 6. The Court does not agree that this statement is false or misleading. 27 C.F.R. § 478.92 requires licensed importers, such as Defendant, to stamp firearms that they import with an importer's mark. The Court is more troubled by paragraph 44, which states:

> During the ATF September 2006 FFL compliance inspection, ADAMS received ATF administrative violations under 478.92(a), in thirty-two (32) instances for removing the importer's marks on 32 of his imported firearms. This is a violation of Title 18 USC § 922 (k) a Federal criminal felony.

*Id.* ¶ 44. During the proffer SA Ortiz agreed that "it is not a crime to not have the importer's marks on [firearms]." Transcript at 88:6-10. This directly contradicts the conclusion in paragraph 44. While the Court is hesitant to conclude that SA Ortiz intentionally inserted this misrepresentation into the warrant affidavit, given SA Ortiz's extensive experience as an ATF agent in the criminal enforcement division, the Court cannot help but find that the misrepresentation was reckless. SA Ortiz holds himself out as someone who has "investigated numerous violations of the Federal criminal statutes, including violations of the Federal firearms laws." Warrant Affidavit Introduction. However, during his testimony, he made no attempt to explain why he included a statement in the warrant affidavit that removing importer's marks was a felony, when it is not. In a complex firearms case, such as this one, a magistrate judge necessarily relies on the expertise of law enforcement officials who are familiar with the requirements imposed on FFLs. SA Ortiz had an obligation to refrain from making reckless,

inaccurate statements about FFL requirements. The Court will excise the final sentence of paragraph 44 from the warrant affidavit.

Third, Defendant objects to the "contention in paragraphs 19-21 that Canadian law enforcement authorities intended to charge Mr. Adams with a crime related to smuggling firearms into the United States." Motion to Suppress at 24. Defendant misreads paragraphs 19-21. These paragraphs explain that (1) SA Ortiz informed Canadian law enforcement officials that Defendant was renting a storage locker in Calgary, Alberta; (2) SA Ortiz told Canadian officials of his suspicion that Defendant was using the storage locker to store firearms Defendant planned on smuggling into the United States; (3) Canadian law enforcement officials searched the storage locker and seized a large quantity of guns; and (4) by keeping firearms in the storage locker, Defendant violated Canadian law, including a law requiring Defendant to register firearms in Canada and a law involving the storage of firearms. Warrant Affidavit ¶¶ 19-21. The warrant affidavit never states that Canadian law enforcement officials intended to charge Defendant with a smuggling crime. Because paragraphs 19-21 are not misleading, the Court will not excise them from the warrant affidavit.

Fourth, according to Defendant, the warrant affidavit omits a material fact: Defendant had obtained an approved ATF Form 6 to import some of the firearms that were later discovered in the Canadian storage locker. The Court acknowledges that the warrant affidavit is not a model of clarity and that the warrant affidavit failed to highlight this fact. However, it is not omitted from the warrant affidavit altogether. To the contrary, the affidavit references both an ATF Form 6 and an ATF Form 6A[4] Defendant submitted for the shipment from Bud Haynes & Company. First, paragraph 21 explains that the ATF Form 6 Defendant submitted for this shipment had

---

[4] A FFL is required to complete an ATF Form 6A for every completed importation, verifying which firearms listed on the approved ATF Form 6 were actually imported. Transcript at 10:1-15.

expired by June 2012. *Id.* ¶ 21. Second, paragraph 39 explains that a Customs and Border

Protection (CBP) official compared the list of firearms seized from the storage locker with the

ATF Form 6A submitted by Defendant. *Id.* ¶ 39. The Court concludes that information regarding

Defendant's submission of an ATF Form 6 application for the firearms later recovered from the

Canadian storage locker was not omitted from the warrant affidavit.

Additionally, at the March 14, 2014 hearing, Defendant elicited testimony about two

misleading statements which were not discussed in the Motion to Suppress. First, paragraph 12

of the Warrant Affidavit states that the IO division of ATF sent a referral to the U.S. Treasury

Department in October 2006 because:

> IOI Raymond GONZALES documented ADAMS importing firearms, then transferring
> 100% of those firearms to his personal collection. At that time, those records also
> indicated that firearms were brought back into the A&D record just before transferring to
> a FFL. Additionally, ADAMS was required to fill out ATF Form 4473, Firearms
> Transaction Record on each of these firearms that were ever transferred to his own
> personal firearms collection and submit the forms through the FBI National Instant
> Criminal Background Check System (NICS), which he failed to do in violation of and
> contrary to 18 USC § 922 (t) (1).

*Id.* ¶ 12. As the Court understands this paragraph, SA Ortiz is alleging that Defendant violated 18

U.S.C. § 922 (t) in 2006, at which time Defendant possessed only one importer's license: the

license associated with his sole proprietorship, Robert E. Adams d/b/a/ Adams International. *Id.*

¶ 9. Defendant produced evidence that this is an incorrect statement of the law. According to the

ATF website, an individual firearms dealer need not execute an ATF Form 4473 when

transferring firearms from the dealer's business inventory to the dealer's personal inventory.

ATF Form 4473 Questions, Defendant's Hearing Exhibit 3. As IOI Duran clarified during her

cross-examination, "the 4473 requirement . . . relates to corporations."[5] Transcript at 55:21-22. When a corporation that possesses a federal firearms license transfers a firearm to a corporate officer for non-business purposes, a Form 4473 must be completed. *Id.* at 56:7-11. However, as of 2006, Defendant did not own a corporate federal firearms license. As a result, he was not required to file Form 4473 documents at that time. *Id.* at 56:12-16.

Once again, at the March 14, 2014 hearing, SA Ortiz did not explain why the warrant affidavit incorrectly states Defendant was required to submit Form 4473 documents for the firearms he transferred to his personal collection during and prior to 2006. The Court acknowledges that SA Ortiz was never directly asked about this part of the warrant. Nevertheless the Court finds that Defendant has produced sufficient evidence that this statement was reckless; the affiant, SA Ortiz was employed by ATF for 27 years. It is reasonable to expect that he would be familiar with ATF requirements. Moreover, it is particularly troubling that there are multiple misstatements regarding FFL requirements in the warrant affidavit. This pattern supports the Court's conclusion that these misstatements were not the results of mere negligence. Furthermore, the Court notes that IOI Duran, another ATF agent, made the same misstatement – that Defendant was always required to complete a Form 4473 whenever he transferred a firearms to his personal collection – during the hearing. In other words, the misstatement in paragraph 12 is not an isolated incident. The ATF agents involved in this case have repeatedly overlooked details that affect the accuracy of their statements.[6] The Court will excise from the warrant

---

[5] The Court notes that IOI Duran initially and incorrectly testified that Defendant "was required to complete an ATF Form 4473 whenever he transferred a firearm to himself." Transcript at 12:11-13. While it appears that IOI Duran was thinking of a situation in which Defendant transferred firearms from his LLC to his personal collection, *see id.* at 13:15-18, she did not qualify her assertion until she was cross-examined on this matter.

[6] It is worth repeating that SA Ortiz based his affidavit, in part, on IOI Duran's criminal enforcement referral summaries. Transcript at 129:11-16, 127:20-23, 124:20-25.

affidavit the fourth sentence of paragraph 12, which begins "Additionally, ADAMS was required
. . .""

Finally, Defendant produced evidence that the expiration dates for the ATF Form 6 applications listed in paragraph 13 of the Warrant Affidavit are incorrect. At the hearing, SA Ortiz initially testified that Defendant possessed approved and unexpired Form 6 applications at the time the warrant was issued. *Id.* at 84:9-10, 85:22-86:6. This testimony is consistent with the information contained in paragraph 13 of the warrant affidavit, which summarizes every ATF Form 6 application, "which ATF had on file for ADAMS." Warrant Affidavit ¶ 13. According to this paragraph, Defendant submitted eleven ATF Form 6 applications between December 2008 and July 2010, all of which expired on October 1, 2010; similarly, the warrant affidavit indicates that Defendant submitted seven ATF Form 6 applications between May 2011 and September 2011, all of which had an expiration date of October 1, 2013. *Id.*

These dates do not add up. As SA Ortiz testified, an approved Form 6 application is only "good for one year." Transcript at 133:7-10. To understand the problem it is helpful to consider an example, such as Permit No. 10-06149, Government's Hearing Exhibit 2, a Form 6 application Defendant submitted on June 25, 2010. This Form 6 application was approved by ATF on September 14, 2010. The Form states that it is "[v]alid for 12 months from the date appearing in Item 18 below," the approval date. Clearly, Permit No. 10-06149 expired on September 14, 2011.

However, the warrant affidavit inaccurately states the expiration date for Permit No. 10-06149 as October 1, 2010. Warrant Affidavit ¶ 13. It is evident that SA Ortiz misread the ATF Form 6 when he wrote the warrant affidavit. On cross-examination, SA Ortiz testified that the expiration date for Permit No. 10-06149 was listed in the upper left-hand side of the form in the

box labeled "Expiration Date." Transcript at 150:10-12. This box appears under the heading:
"Federal Firearms License *(If Any)*" and next to a box labeled "License No." It is the expiration
date for Defendant's federal firearms license, not the expiration date for the form itself. In other
words, the expiration dates listed in the warrant affidavit are incorrect.[7] The ATF Form 6
applications Defendant submitted in 2011 would have expired one year after the approval dates,
which are not listed in the warrant affidavit and are not otherwise available to this Court.

After carefully reviewing the record, the Court concludes that SA Ortiz acted recklessly
when he inaccurately transcribed the expiration dates into the warrant affidavit. The Court bases
this conclusion on (1) SA Ortiz's 27 years of experience with ATF, (2) his own admission that he
knew that an approved ATF Form 6 application was only good for one year, (3) SA Ortiz's
statement in the warrant affidavit that the ATF Form 6 filed by Defendant for the shipment from
Bud Haynes had a "1 year expiration date," Warrant Affidavit ¶ 21, (4) his review of 18 Form 6
applications, that, according to his summary all had the same "expiration date" despite having
different application dates, (5) his decision not to include the approval (or denial) date in his
summary in the warrant affidavit, and (6) his reaction to the mistake at the March 14, 2014
hearing.

At the hearing, defense counsel identified the discrepancy between the expiration dates as
stated in the warrant affidavit and SA Ortiz's testimony that an ATF Form 6 is valid for one-
year, but SA Ortiz did not immediately recognize his mistake. Transcript at 140:18-141:4. After
further discussion, defense counsel asked SA Ortiz: "The point is the expiration dates aren't
really the dates that the permits are expiring, right?" SA Ortiz replied: "It seems that way. Again,

---

[7] See also Permit No. 08-06213, Government's Hearing Exhibit 13. The approval date on this form is
September 2, 2008. According to SA Ortiz's testimony and according to the terms of the form itself, it
was good for one year until September 2, 2009. However, the expiration date as listed in the warrant
affidavit is October 1, 2010, the expiration date for Defendant's federal firearms license.

I was just summarizing what I saw on the form." *Id.* at 151: 15-18. On redirect he elaborated on his mindset when drafting the warrant affidavit, "I was just summarizing what I saw on the form. If it said expiration date, I typed it up, I put it in there, I wasn't addressing whether the form was valid or not. I was just putting the expiration date out of a block I saw on the form." *Id.* at 184:22-25. SA Ortiz's insouciant attitude is troubling to the Court. It demonstrates a disregard for his duty to accurately present the facts to the magistrate judge. The Court will excise the portions of the warrant affidavit that include the expiration dates for the ATF Form 6 applications.

### B. Probable Cause

The Court must now consider whether the excised affidavit supports a finding of probable cause. Probable cause exists if "the facts presented in the affidavit would warrant a man of reasonable caution to believe that evidence of a crime will be found at the place to be searched." *United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1330 (10th Cir. 2003) (internal citation omitted). Here, the warrant affidavit alleges that a search of Defendant's property will uncover evidence of various crimes including firearms smuggling, tax evasion, and failure to maintain appropriate firearms records. However, the parties' briefing focuses almost exclusively on firearms smuggling. Thus, the Court will first address whether there was probable cause to believe Defendant violated 18 § U.S.C. 545.

The Government contends that the magistrate judge would have been justified in finding probable cause based solely on the allegations that (1) Defendant submitted 18 Form 6 applications to import firearms between 2008 and 2011, as detailed in paragraph 13, but (2)

13

database queries "do not show the definitive importation of hundreds of firearms listed" on these applications.[8] Warrant Affidavit ¶ 13. The Court disagrees.

According to the warrant affidavit, Defendant submitted 18 Form 6 applications between 2008 and 2011, only one of which was unconditionally approved. One was withdrawn; two were approved conditionally; one was partially approved; one was approved with restrictions; five were disapproved or marked void; and seven did not have a "status" listed in the warrant affidavit. *Id.* In other words, of the 18 Form 6 applications Defendant submitted, only five were approved in some form or fashion.

At the hearing the Government attempted to contest this fact by suggesting that the seven Form 6 applications with no status were in fact approved and valid. There are two problems with this argument. First, and most importantly, nothing in the warrant affidavit, which it is this Court's job to review, indicates that the Form 6 applications lacking a status are valid. Second, the Court does not find SA Ortiz's testimony on this point credible. SA Ortiz's testimony regarding the meaning of a missing status was inconsistent. The first time Defendant questioned SA Ortiz about a Form 6 application without a status, SA Ortiz simply replied "It wasn't void or rejected." *Id.* at 136:14-15.

Shortly thereafter, Defendant returned to this point, asking how the magistrate judge would know from the affidavit whether the Form 6 applications without a listed status were ever approved by ATF. *Id.* at 141:16-19. SA Ortiz stated: "It is possible the ones you are pointing out, sir, that these are ones that he was importing for other people and not for himself, so it is possible that those forms are a little different. Again, this is just speculation, not having the form in front

---

[8] In the Response, the Government argues "[i]f the affidavit in support of the search warrant contained no allegations other that [sic] those contained in paragraph 13, it would be sufficient to support a finding of probable cause to search defendant Adams' home and business for firearms illegally imported into the United States." Response at 8.

of me." *Id.* at 141:20-24. However, as Defendant pointed out, SA Ortiz's proposed explanation did not hold water. Some of the Form 6 applications without a status are applications for guns Defendant planned to import for himself and some are applications for guns Defendant planned to import for someone else. *Id.* at 142:23-143:1.

After making this clarification, Defendant again asked SA Ortiz about a Form 6 application without a listed status; "How do we know what ATF did with it? How do we know what ATF's approval was? Did they approve it or not approve it?" This time SA Ortiz replied: "Some forms didn't have a status block. I didn't see a status block, otherwise I would have typed it, is my recollection." *Id.* at 143:19-25. Only after this sequence of exchanges did SA Ortiz begin to firmly assert that the forms without a status must be valid, because, these forms were "not shown to be disapproved or void." *Id.* at 183:11-15.

In addition to being inconsistent, SA Ortiz's testimony is odd. According to SA Ortiz, ATF approved 12 of the Form 6 applications submitted by Defendant, but only marked five of these forms as approved in the status block.  Inexplicably, the remaining seven forms were not marked or stamped with any status at all. This strikes the Court as highly unusual and hard to believe.

The Court does not discount SA Ortiz's testimony lightly. The Court has carefully reflected on its impression of SA Ortiz and thoroughly reviewed the hearing transcript. Unfortunately, it is clear that SA Ortiz is not well-informed about the ATF Form 6 application process.[9] For example, SA Ortiz could not clearly explain what it meant for a form to be approved conditionally, as opposed to approved partially, as opposed to approved with restrictions. *Id.* at 137:10-13, 138:22-139:11, 148:3-15. Moreover, as previously discussed, SA

---

[9] SA Ortiz testified that he never processed Form 6 applications. *Id.* at 120:17-20. In fact, at one point when he was being questioned about the expiration dates he stated "I'm not in the Imports Branch. I don't know what they do." *Id.* at 144:12.

Ortiz misread the expiration dates on the ATF Form 6 applications. The Form 6 applications that lacked a status block may have "appeared to be . . . approved" to SA Ortiz, *id.* at 149:13-15, but this is not dispositive.

The issue facing the Court is to determine whether the information contained in the warrant affidavit supports a finding of probable cause. In other words, the Court must address how Defendant's submission of 18 Form 6 applications, only five of which were approved, affects the probable cause analysis. As an initial matter, the Court notes that it is not entirely clear from the Warrant Affidavit that Defendant did not import any of the firearms listed on the approved ATF Form 6 applications. The affidavit merely states "[d]atabase queries by HSI do not show the definitive importation of hundreds of firearms listed on the ATF Form 6 Part 1 importation applications." Warrant Affidavit ¶ 13. Additionally, the affidavit explains that IOI Duran conducted an import query in 2010, prior to the expiration of some if not all of the approved forms, which indicated that Defendant had not imported any firearms using either of his importer's licenses since November 2007.[10] *Id.* ¶ 7.

However, even if Defendant never used the five approved Form 6 applications, this is not suspicious by itself. As Defendant emphasized, only one of these forms was approved unconditionally. One form was approved partially, and there were restrictions or conditions placed on three of the forms, which may or may not have affected Defendant's ability or desire

---

[10] The Court notes that is it not sure whether an import query would uncover all lawfully imported firearms. Paragraph 7 of the warrant affidavit states that, according to the import query, Defendant did not import any firearms in 2008. The affidavit then immediately explains: "[a]dditional searches by CBP found an importation of firearms dated September 3, 2008 from London Armory to ADAMS INTERNATIONAL." The Court is not sure how to interpret this. *Id.* ¶ 7.

to import firearms using these forms.[11] Furthermore, Defendant produced evidence that approximately 50% of Form 6 applications expire without being used and are renewed by the importer. *See* Reply at 8 (citing 79 F.R. 7392). In light of this information, the Court cannot conclude that the mere failure to use a handful of ATF Form 6 applications prior to expiration is unusual or otherwise indicative of criminal behavior.

Although the Court rejects the Government's contention that paragraph 13 is sufficient standing alone to support a finding of probable cause, the analysis does not end here. The Court cannot consider Defendant's practice of submitting Form 6 applications in isolation. "While one fact alone may not support a finding of probable cause, a cumulative assessment may indeed lead to that conclusion." *United States v. Cantu*, 405 F.3d 1173, 1177 (10th Cir. 2005). In this case, the Court concludes that additional information in the warrant application tips the balance in favor of the Government. The Court will briefly summarize the relevant information:

- As of 2009, Defendant was failing to accurately record his firearms transactions as required by federal law. A comparison of Defendant's 2006 and 2009 business records revealed that Defendant had deleted and manipulated numerous entries between 2006 and 2009;

---

[11] With the encouragement of Mr. Cairns, SA Ortiz attempted to downplay the significance of these unidentified restrictions. On redirect, SA Ortiz testified that the conditional approval of Permit No. 10-6149, meant that one of a total 75 firearms was "stricken from the shipment as being approved for importation." Transcript at 184:1-17. According to SA Ortiz, ATF disallowed number 21 on the list. *Id.* Once again, the Government and SA Ortiz have misunderstood the Form 6 application. There appears to be a blemish on the Government's copy of Permit No. 10-6149, Government's Hearing Exhibit 2. On page 2, there are three marks that take the shape of a line: one directly below the date and fax number at the top of the page, the second runs through number 21 on the list of firearms, and the third, which is much fainter, starts immediately above number 52 on the list. These three marks are visible, to some degree, in the same place on each of the later pages of Exhibit 2. On the last pages, the first and third marks become very faint and dot-like, however the second mark remains fairly prominent and in the same location. These marks do not appear to have any meaning. In fact, 27 CFR § 479.113 explains the concept of conditional importation; a conditional importation is not the disallowing of part of an application, rather a conditional importation is permitted for "the purpose of examining and testing the firearm in connection with making a determination as to whether the importation or bringing in of such firearm will be authorized."

- During 2006 and 2009 administrative inspections of his business, Defendant was uncooperative and evasive. On both occasions he initially told ATF inspectors that he was on vacation and asked to reschedule. In 2009, he relinquished one of his three firearms licenses and denied having any firearms or doing any business under his remaining two licenses, although he was actively advertising guns for sale on three websites: "www.adamsguns.com," "www.gunbroker.com," and "www.gunsamerica.com;"

- Defendant regularly advertised guns for sale as having no importer's marks. While this does not necessarily demonstrate that Defendant illegally imported these guns, rather than purchasing them within the United States, it does show that Defendant had a monetary interest in selling imported, but hard-to-track firearms;

- In May 2009, Defendant made at least two trips from Canada to the United States by automobile. In April 2011, Defendant flew to Canada without a return ticket and drove from Canada to the United States five days later; and

- Finally, Bud Haynes & Company Auctioneers trans-shipped 133 firearms to Defendant in 2011. These firearms never crossed through customs. Canadian officials later discovered that Defendant had stored the shipment in a storage locker in violation of Canadian law. After seizing the firearms, Canadian officials confirmed that all of the firearms except one were recovered. Notably, around the time of shipment, Defendant had obtained an approved Form 6 application to import some but not all of the firearms in the shipment. There were 51 firearms in the shipment that were not listed on the Form 6A submitted by Defendant.

Of these facts, the Court considers Defendant's behavior regarding the shipment from Bud Haynes & Company to be the most significant. Defendant purchased firearms from a Canadian company for shipment to the United States, but did not seek approval to import the entire shipment. Instead, the shipment was diverted and placed in a storage locker in violation of Canadian law. This sequence of events strongly suggests that Defendant intended to clandestinely transport the 51 unapproved firearms into the United States.

Of course, as Defendant emphasizes, all but one of the firearms Defendant purchased from Bud Haynes & Company were in the possession of Canadian law enforcement officials at the time SA Ortiz applied for a warrant to search Defendant's home and business. There was no probable cause to search for the firearms already seized by Canadian officials. However, SA

Ortiz did not draft a warrant to search for the one missing gun, a .22 caliber rifle. The Government's objective, in obtaining the search warrants, was broader; the Government wanted to search Defendant's home and business for firearms the Government believed Defendant smuggled into the country on other occasions. In other words, the Government alleged that there was probable cause to believe Defendant was engaged in an ongoing smuggling operation. While this is a close case, there is evidence that Defendant planned on smuggling some of the firearms he purchased from Bud Haynes & Company into the United States. Given Defendant's failure to keep adequate records, his uncooperative and evasive behavior, and his demonstrated financial interest in smuggling, a reasonable person would be justified in believing that Defendant had smuggled firearms previously.

Defendant argues that the Government's response brief undermines this conclusion because the Government admits that it is unable to prosecute Defendant for smuggling a large number of firearms. However, the Court does not interpret the Government's admission that it cannot prove Defendant smuggled numerous firearms into the United States beyond a reasonable doubt as an admission that it lacked probable cause to search Defendant's home and business. "[P]robable cause does not require metaphysical certitude or proof beyond a reasonable doubt. Probable cause is a matter of probabilities and common sense conclusions, not certainties." *United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010) (internal citation omitted). Direct evidence of smuggling is not required for the Court to conclude that probable cause exists.

Finally, Defendant contends that the search warrants are invalid because the information supporting probable cause is stale, outdated, and old. The last time Defendant submitted a Form 6 application, as documented in the warrant affidavit, was in September 2011, more than fifteen months before the Government obtained the warrants. The last ATF inspection of Defendant's

19

business occurred in the fall of 2009, over three years prior to January 2013. However, the Court does not consider the lapse in time between the ATF inspections and the issuance of the warrant to be problematic. Information about Defendant's past conduct is not stale merely because it is old; information becomes stale only when it "no longer suggests that the items sought will be found in the place to be searched." *United States v. Roach*, 582 F.3d 1192, 1201 (10th Cir. 2009).

Here, the information about Defendant's past activities as a FFL remains probative because Defendant was continuing to operate a firearms business at the time the warrant was issued; as of 2013, Defendant possessed a valid FFL associated with his business address. It was reasonable to think that Defendant would still possess evidence of previous smuggling ventures, in the form of smuggled firearms he had not yet sold or in the form of paperwork connected to these firearms. Furthermore, as previously discussed, the warrant affidavit supports a finding that Defendant had been engaged in a smuggling operation for some time. It is self-evident that "ongoing and continuous activity makes the passage of time less critical when judging the staleness of information upon which a search warrant is based." *Id.*

Because the Court concludes that the warrant affidavit contained sufficient facts to support probable cause that Defendant was engaged in regular firearms smuggling, the Court will not address at length the allegations that Defendant violated firearms recordkeeping laws or failed to pay required taxes. The Court notes that neither party directly explicates these portions of the warrant. While the warrant contains detailed information about Defendant's alleged failure to properly record and track his firearms transactions, the allegations concerning tax evasion are more opaque. It is not clear to the Court whether the Government believes there is evidence, independent of the evidence pertaining to firearms smuggling, that Defendant sold firearms on which he failed to pay the required excise taxes. In any event, Defendant does not appear to

20

dispute that the allegations of ongoing smuggling are sufficient, if valid, to justify the seizure of

the evidence sought to be suppressed in this case: firearms and firearms-related paperwork. For

these reasons, the Court will limit its holding, that the warrant affidavit supports probable cause,

to the issue of firearms smuggling.[12] The Court will now address Defendant's other challenges to

the warrant affidavit.

## II.    Particularity Requirement

Under the Fourth Amendment, a warrant must particularly describe both the place to be

searched and the things to be seized. *United States v. Brown*, 984 F.2d 1074, 1077 (10th Cir.

1993). In other words, a "search should be confined in scope to particularly described evidence

relating to a specific crime for which there is demonstrated probable cause." *Id.* Whether a

warrant is sufficiently "particular" is a practical determination. The test is one of reasonableness:

is "the description . . . as specific as the circumstances and the nature of the activity under

investigation permit"? *United States v. Leary*, 846 F.2d 592, 601 (10th Cir. 1988). The goal is to

preclude "general, exploratory rummaging in a person's belongings." *Id.* at 600.

Defendant argues that the warrants lack necessary limitations and do not satisfy the

particularity requirement. According to Defendant the warrants are unconstitutionally broad

because they permitted the Government to seize (1) any firearm the government believed was

smuggled into the United States, and (2) every piece of paper and business record belonging to

Mr. Adams.

First, Defendant's complaint concerning the authorization to seize all smuggled firearms

is simply a restatement of Defendant's contention that the warrant affidavit, at most, supports

only a finding of probable cause that Defendant smuggled one .22 caliber rifle into the United

---

[12] If either party would like to further develop the record by providing briefing on the issue of whether the warrant affidavit supports probable cause to believe Defendant engaged in tax evasion, that party should inform the Court by filing a motion for reconsideration.

States. The Court has already addressed this argument and found that the warrant contained sufficient information to conclude that Defendant was engaged in an ongoing smuggling operation. The Court rejects Defendant's contention that the affidavit could have been more narrowly drawn to specify the types of smuggled firearms. *See United States v. Shoffner*, 826 F.2d 619, 631-632 (7th Cir. 1987) (holding that a warrant authorizing the seizure of stolen automobile parts was not overly broad because the affidavit "averred a continuing criminal scheme involving stolen automobiles" and it was reasonable "to believe that some of the vehicles named in the affidavit would no longer be on the premises when [officers] executed the search warrant, and that others would have been added.").

Second, the Court acknowledges that the warrants are incredibly broad insofar as they authorized the seizure of all of Defendant's business records and most if not all of Defendant's personal records. The warrants permitted law enforcement agents to seize "items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money," "[c]elluar telephones . . . and any stored electronic communications contained therein," "sales receipts for items evidencing the expenditure of currency or currency equivalents," "any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers of . . . other individuals or businesses with whom a financial relationship exists," and "records relating to the procurement, purchase, shipment, acquisition and importation into the United States of merchandise . . ." Warrant, Items to be Seized (Doc. No. 28-2) ¶¶ 3, 5, 6, 8, 17. There was only one limitation in the warrants: the evidence seized was required to relate to the crimes of firearms smuggling, failure to keep firearms records, and tax evasion. *Id.* ¶ 18.

Unlike warrants that have been upheld by the Tenth Circuit in firearms, fraud and export cases, these warrants did not limit the officers to seizing documents related to a particular

transaction or type of transaction or to documents within a certain date range. [13] *See United States v. Thao Dinh Le*, No. 98-5088, 1999 U.S. App. LEXIS 5794, at *44-47 (10th Cir. 1999) ("the warrant, by authorizing a search for documents relating to firearms transactions, did provide a meaningful limitation."); *In re Search of Kitty's East*, 905 F.2d 1367, 1375 (10th Cir. 1990) ("Because the executing officers could not, in compliance with the warrant, seize any and all business records on Kitty's premises, but rather were restricted to those referring to certain products, certain businesses or individuals, and certain time periods, we hold that the provisions of the national warrant were not facially overbroad.").

However, even if the portions of the warrant authorizing the seizure of personal records were overly broad, this does not automatically mandate the suppression of all evidence seized under the warrant. "[W]here a warrant contains both specific as well as unconstitutionally broad language, the broad portion may be redacted and the balance of the warrant considered valid." *Brown*, 984 F.2d at 1077. In determining if the severability doctrine is applicable, a court must first "divide the warrant into individual phrases, clauses, paragraphs, or categories" and determine whether the valid portions of the warrant, if any, may be "meaningfully severed" from the invalid portions of the warrant. *United States v. Sells*, 463 F.3d 1148, 1155, 1158 (10th Cir. 2006). Finally, as long as the valid portions "make up the greater part of the warrant," the court will sever the valid portions of the warrant, suppressing only the evidence seized under the invalid portions. *Id.*

---

[13] The Court acknowledges that the warrant affidavit accuses Defendant of tax evasion. However, in its response briefing, the Government never attempts to justify the portions of the warrant authorizing the seizure of personal, non-firearms related documents as necessary to uncover evidence of tax evasion. Because the Court concludes that these portions are severable and the parties did not provide thorough briefing on the validity of these portions of the warrant, the Court will not otherwise address the matter, except to note that "it would require extraordinary proof to demonstrate that an individual's entire life is consumed by fraud and that all records found in the home were subject to seizure." *United States v. Falon*, 959 F.2d 1143, 1148 (1st Cir. 1992).

23

Here, the warrants authorized the seizure of three broad categories of evidence: smuggled firearms, firearms records, and other personal records that were not firearms-related. The Court has already outlined the reasons the portions of the warrant dealing with smuggled firearms are sufficiently particular: Defendant was suspected of continuous violations of federal firearms laws, not simply violations relating to a particular transaction. Under these circumstances, it was not feasible for the Government to draft a more specific warrant. Additionally, like in *Thao Dinh Le*, the portions of the warrant authorizing the seizure of firearms records adequately circumscribed the Government's discretion and provided acceptable limitations given the circumstances.

The Court now concludes that these valid portions of the warrant may be meaningfully severed from the portions of the warrant pertaining to Defendant's personal records. The section of the warrant that cites the smuggling statute and empowers the Government to seize firearms and "any records or receipts pertaining to firearms and ammunition" is contained in its own paragraph, separate from the sections allowing the seizure of personal records. Warrant, Items to be Seized (Doc. No. 28-2) ¶ 11.

Finally, the Court finds that the portions of the warrant involving firearms and firearms paperwork predominate. In making this determination, the Court considered both the number of provisions relating to firearms or firearms records and the qualitative nature of the warrant. Here, the bulk of the warrant focused on firearms paperwork and records. This reading of the warrant is bolstered by the manner in which the warrant was executed. SA Ortiz testified that the officers executing the warrant left behind mounds of documents after sorting for documents relevant to the case, such as receipts of firearms, repairs of firearms, importation documents, and other ATF documents. Transcript at 102:11-103:11. Moreover, the portions of the warrant authorizing the

seizure of personal records did not expand the areas of Defendant's home or business in which

the Government could search for records related to firearms offenses. For these reasons, the

Court finds that it need not suppress the firearms or the Form 4457 documents seized by the

Government consistent with the portions of the warrant involving smuggled firearms and

firearms records.

### III.      Execution of the Warrant

Finally, Defendant claims that the Court should suppress the evidence seized by the

Government because the Government grossly exceeded the scope of the warrants. According to

the Defendant, the Government improperly seized all the firearms in Defendant's possession. In

addition, Defendant claims the Government seized personal items such as toy guns, flare guns,

model guns, World War II memorabilia, a Home Depot credit card application, paint chip

samples, DVD movies, a Gun World Magazine from 1964, and business cards.

Normally, when items outside the scope of a valid warrant are seized, the remedy is

suppression and return of those items, not invalidation of the entire search. Complete suppression

is an "extreme" remedy, *United States v. Allen*, 416 F. App'x 754, 759 (10th Cir. 2011),

appropriate only "when law enforcement officers grossly exceed the scope of a search warrant in

seizing property" and, as a result, transform an otherwise valid warrant into a general warrant.

*United States v. Foster*, 100 F.3d 846, 849-850 (10th Cir. 1996) (emphasis added). In

determining whether complete suppression is appropriate, courts generally consider the officer's

reason for contravening the limitations contained in the warrant.

Violations motivated by practical concerns do not demonstrate sufficient disregard for the

law to warrant complete suppression. *See United States v. Uzenski*, 434 F.3d 690, 706 (4th Cir.

2006) ("Nor is blanket suppression appropriate where the agents exceed the limits of their

authority under the warrant based on practicality considerations or mistake."); *Marvin v. United States*, 732 F.2d 669, 674-675 (8th Cir. 1984) (finding that complete suppression was inappropriate because "the agents attempted to stay within the boundaries of the warrant and . . . the extensive seizure of documents was prompted largely by practical considerations and time constraints."). For example, in *United States v. Hargus*, 128 F.3d 1358, 1363 (10th Cir. 1997), Government agents seized an entire file cabinet full of documents, only some of which were covered by the search warrant. However, the Tenth Circuit held that "the officers did not grossly exceed the warrant in concluding they did not need to examine at the site every piece of paper in both cabinets." *Id.*

Like in *Hargus*, Government agents did not grossly exceed the scope of the search warrants in deciding that it was necessary to seize all of Defendant's firearms to determine which firearms were smuggled firearms. Given the large number of firearms in Defendant's home and business and the general disarray in which he kept his paperwork,[14] it is not realistic to expect the law enforcement officers executing the search warrants to determine on site, on a gun-by-gun basis, whether there was reason to believe each gun was smuggled into the country. Likewise, SA Ortiz testified that the seizure of any personal items, such as paint chips, was accidental. Transcript at 101:19-102:7, 102:22-103:4. Defendant's paperwork and firearms records were not neatly organized. It is possible that Government agents accidently kept some personal items when sorting through these piles of documents. This kind of mistake is not grounds for complete suppression of all evidence.

---

[14] At the hearing, the Government produced photographs of Defendant's home which were marked as Government's Exhibits 7a -7q.

In the absence of any evidence that the officers executing the search warrant went on a general rummaging expedition for evidence of crimes other than firearms smuggling, the Court will not invalidate the entire search of Defendant's residence and business premises.

IT IS THEREFORE ORDERED that DEFENDANT ROBERT E. ADAMS' MOTION TO SUPPRESS EVIDENCE OR, IN THE ALTERNATIVE, TO HOLD A FRANKS HEARING, AND MEMORANDUM IN SUPPORT THEREOF (Doc. No. 28) is DENIED.

_____
SENIOR  UNITED  STATES  DISTRICT  JUDGE