# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**
      Plaintiff,

vs.

                                         Cr. No. 13-3301 JAP

**ROBERT E. ADAMS,**
      Defendant.

## MEMORANDUM OPINION AND ORDER

On May 2, 2014, Defendant Robert E. Adams filed a motion asking the Court to reconsider its denial of Defendant's motion to suppress the evidence seized from Defendant's home and business properties in January 2013. *See* DEFENDANT ROBERT E. ADAMS' MOTION TO RECONSIDER THE ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OR, IN THE ALTERNATIVE, TO HOLD A FRANKS HEARING (Doc. No. 48) (Motion to Reconsider). Defendant argues that the Court's denial resulted from its misapprehension of material facts concerning: (1) the dates of Defendant's 2011 travel to Canada, (2) the results of the 2006 and 2009 administrative compliance inspections of Defendant's firearms businesses, and (3) the contents of the importation paperwork submitted by Defendant regarding his purchase of firearms from Bud Haynes & Company Auctioneers (Bud Haynes & Company), a Canadian auction house.

In the response, the Government admits the Court mistakenly concluded that Defendant neglected to obtain approval, using a Form 6, to import 51 of the 133 firearms Defendant purchased from Bud Haynes & Company. But, the Government takes the position that this mistake was de minimis and opposes Defendant's Motion to Reconsider. *See* UNITED STATES' RESPONSE TO DEFENDANT ROBERT E. ADAMS' MOTION TO RECONSIDER THE ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OR, IN

1

THE ALTERNATIVE TO HOLD A FRANKS HEARING (Doc. No. 57) (Response). The Government asks the Court to reaffirm the validity of the warrants, which authorized agents to search Defendant's possessions for evidence of firearms smuggling and related crimes.

On May 20, 2014, the Court held a hearing during which it questioned counsel about the importation process and asked counsel for the Government to identify all of the factors contained in the warrant affidavit that would give a reasonable person probable cause to believe Defendant was engaged in firearms smuggling.[1] The Government highlighted the following allegations: (1) Defendant was not keeping adequate records of his firearms transactions, (2) Defendant was advertising firearms for sale as not having importer's marks, (3) Defendant had submitted but failed to use multiple Form 6 applications to import firearms into the United States, and (4) Defendant purchased firearms from Bud Haynes & Company, which the Government contends he attempted to smuggle into the United States.

The Court held a second hearing on June 26, 2014, after Defendant filed DEFENDANT ROBERT E. ADAMS' UNOPPOSED MOTION FOR LEAVE TO FILE A RESPONSE TO

---

[1] The warrant affidavit alleges that Defendant, a federal firearms licensee (FFL), violated firearms recordkeeping requirements, smuggled firearms into the United States, and evaded tax liability on his firearms activities in violation of federal law. Warrant Affidavit, Exhibit A to DEFENDANT ROBERT E. ADAMS' MOTION TO SUPPRESS EVIDENCE OR, IN THE ALTERNATIVE, TO HOLD A FRANKS HEARING, AND MEMORANDUM IN SUPPORT THEREOF (Doc. Nos. 28-1 & 28-2) (WA). At the behest of the parties, the Court has concentrated on the issue of firearms smuggling. On May 7, 2014, the Court sent the parties a letter requesting additional briefing on the issue of whether the allegations contained in the warrant affidavit concerning recordkeeping violations and tax evasion supported the seizure of the evidence Defendant seeks to suppress, even if there is not probable cause to believe Defendant was engaged in an ongoing smuggling operation. However, the Government declined to file a supplemental brief on this topic. The Government specifically admitted that the allegations concerning tax evasion "would not have allowed the [G]overnment to seize the firearms and importation records which are the core of the [G]overnment'[s] case against [D]efendant." Response at 17. Based on these representations, the Court will limit its attention to firearms smuggling and will disregard the sections of the warrants accusing Defendant of committing other crimes. The Government has had ample opportunity to defend the warrants on the grounds of its choosing and its silence speaks strongly to its opinion about the value of the recordkeeping and tax allegations. Nonetheless, the Court trusts that the Government will alert the Court if the Court has somehow misinterpreted the Government's adamant refusal to address these sections of the warrant affidavit.

UNITED STATES' SUPPLEMENTAL BRIEF REGARDING DEFENDANT ROBERT E. ADAMS' MOTION TO RECONSIDER THE ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE, OR, IN THE ALTERNATIVE TO HOLD A FRANKS HEARING (DOC. 69) (Doc. No. 70) indicating that Defendant disagreed with some of the facts the Government labeled as "undisputed."[2] After reviewing the evidence, considering oral argument, and examining the briefs,[3] the Court meticulously reread the warrant affidavit. Because the Court now concludes that the excised affidavit does not support a finding of probable cause, the Court will grant Defendant's Motion to Reconsider and will suppress all evidence seized from Defendant's home and business properties during the January 2013 searches.

## BACKGROUND

### I.     The Warrant Affidavit

In January 2013, Special Agent Frank Ortiz (SA Ortiz), a former Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) agent, prepared a 41-page warrant affidavit, which he used to secure warrants to search Defendant's home and business properties. *See* January 2013 Warrants, Exhibits A-D to DEFENDANT ROBERT E. ADAMS' MOTION TO SUPPRESS EVIDENCE OR, IN THE ALTERNATIVE, TO HOLD A FRANKS HEARING, AND MEMORANDUM IN SUPPORT THEREOF (Motion to Suppress) (Doc. Nos. 28-1 through 28-9). During the execution of these warrants, SA Ortiz and other law enforcement officials seized

---

[2] At both hearings, Norman Cairns and Kimberly Brawley represented the Government; Vincent Ward represented Defendant Adams, who was present.
[3] The briefing considered by the Court includes DEFENDANT ROBERT E. ADAMS' REPLY TO THE UNITED STATES' RESPONSE (DOC. 57) TO DEFENDANT'S MOTION TO RECONSIDER THE ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE, OR, IN THE ALTERNATIVE TO HOLD A FRANKS HEARING (DOC. 48) (Doc. No. 66) (Reply), UNITED STATES' SUPPLEMENTAL BRIEF REGARDING DEFENDANT ROBERT E. ADAMS' MOTION TO RECONSIDER THE ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE, OR, IN THE ALTERNATIVE TO HOLD A FRANKS HEARING (Doc. No. 69), and DEFENDANT ROBERT E. ADAMS' RESPONSE TO THE UNITED STATES' SUPPLEMENTAL BRIEF REGARDING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (DOC. 69) (Doc. No. 74).

approximately 1,600 firearms, most of which have since been returned to Defendant. Officials also seized firearms-related paperwork. The Government seeks to use this evidence against Defendant at trial.

## II.   Defendant's Motion to Suppress and the Court's Prior Ruling

In the Motion to Suppress, Defendant asserted that SA Ortiz knowingly or recklessly made false statements and omitted material information from the warrant affidavit. *See* Motion to Suppress at 22. Defendant argued that once these inaccuracies were disregarded the warrant affidavit would lack sufficient factual allegations to support a finding of probable cause. *Id.* at 26. In other words, Defendant asked the Court to suppress the evidence seized under the search warrants in accordance with *Franks v. Delaware*, 438 U.S. 154 (1978).

In ruling on this request, the Court first considered whether Defendant had carried his burden of showing by a preponderance of the evidence that there were mistakes in the warrant affidavit and that these mistakes were either intentional or reckless.[4] *See* MEMORANDUM OPINION AND ORDER (Doc. No. 39 at 5-13). The Court carefully reflected on its impression of SA Ortiz, an individual with 27 years of experience working with ATF, and concluded that SA Ortiz acted recklessly when he inaccurately claimed (1) that the removal of importer's marks was a felony and (2) that Defendant violated 18 U.S.C. § 922(t)(1) in 2006 by failing to file ATF Form 4473 documents. The Court based this conclusion on SA Ortiz's alleged expertise, its impression of SA Ortiz's credibility at the March 14, 2014 hearing, and the pattern of

---

[4] The Court "may infer [that an affiant acted with] reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994) (internal citations omitted).

4

misstatements in the warrant affidavit.[5] Consequently, the Court excised those parts of the warrant affidavit.

Additionally, the Court found that SA Ortiz recklessly transcribed the expiration dates for Defendant's ATF Form 6 permit/permit applications[6] into the warrant affidavit. As a result of this recklessness, SA Ortiz misled the magistrate judges who reviewed the warrant affidavit into believing that Defendant possessed at least one approved permit to import firearms at the time the warrant was issued. This was almost certainly incorrect. According to SA Ortiz's warrant affidavit, Defendant last submitted an ATF Form 6 seeking approval to import firearms on September 21, 2011. WA ¶ 13. SA Ortiz's warrant affidavit does not indicate when this form was processed or whether this particular form was ever approved. Yet, ATF Form 6 permits have a one-year expiration date. TRANSCRIPT OF MARCH 14, 2014 HEARING (Doc. No. 38 at 133:7-10) (March Transcript). It is, therefore, safe to say Defendant did not have ATF approval to import firearms at the time the warrant was issued, as SA Ortiz's warrant affidavit wrongly suggests. To address this error, the Court excised the portions of the warrant affidavit that contained the false expiration dates.

The Court then considered whether the excised warrant affidavit supported a finding of probable cause and concluded that it did. *See* MEMORANDUM OPINION AND ORDER (Doc. No. 39 at 13-20). The Court based its decision on its understanding of the factual allegations contained in the warrant affidavit, including a series of allegations involving Defendant's purchase of firearms from Bud Haynes & Company, a Canadian auction house, and his 2011 attempt to transship these firearms into the United States. As the Court understood the facts,

---

[5] While the Government disagrees with the Court's finding that SA Ortiz acted in a reckless manner, it admits that he has "speculated about procedures and protocols of which he had inadequate expertise." Response at 57.
[6] An ATF Form 6 is a document an FFL submits to obtain permission to import firearms into the United States; if stamped approved, the ATF Form 6 acts as an importation permit.

Defendant had (1) purchased 133 firearms from Bud Haynes & Company; (2) obtained an approved Form 6 permit from ATF to import some, but not all of these firearms; (3) began the process of shipping all of the 133 firearms into the United States, without the required approved ATF Form 6 for 51 of the 133 firearms; but (4) eventually diverted the entire shipment and placed the firearms in a storage locker in Canada in violation of Canadian law.

Defendant now argues that the Court should have excised additional statements from the warrant affidavit, namely (1) the statement that Defendant flew to Canada on April 12, 2011 without a return ticket and (2) the affiant's characterization of the results of the ATF administrative compliance inspections, particularly the statement that a review of Defendant's 2009 business records showed that he was manipulating the records in violation of federal law. More importantly, Defendant contends – and the Government agrees – that the Court misconstrued a key fact concerning Defendant's approval to import the entire shipment of firearms purchased from Bud Haynes & Company.  Defendant maintains that this mistake caused the Court to incorrectly rule that the excised warrant affidavit supports a finding that Defendant was operating an ongoing smuggling operation.

## STANDARD OF REVIEW

### I.      Motion to Reconsider

The Federal Rules of Criminal Procedure do not specifically authorize the filing of motions to reconsider. However, a district court is allowed to correct "alleged errors in its dispositions." *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014). As in a civil case, the Court may grant a motion to reconsider:

> when the court has misapprehended the facts, a party's position, or the law. Specific grounds include: (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice. A motion to reconsider should not be used to revisit

issues already addressed or advance arguments that could have been raised earlier.

*Id.* (internal citations omitted). Here, the parties agree that the Court made a significant factual error. Thus, it was appropriate for Defendant to file a motion to reconsider and for the Court to reconsider its prior decision in light of the true facts.

## II.    Franks v. Delaware

A court must invalidate a search warrant and suppress the evidence seized under the warrant if the defendant shows that "(1) . . . the affiant knowingly or recklessly included false statements in or omitted material information from an affidavit in support of a search warrant and (2) . . . after excising such false statements and considering such material omissions, . . . the corrected affidavit does not support a finding of probable cause." *United States v. Garcia-Zambrano*, 530 F.3d 1249, 1254 (10th Cir. 2008) (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). In other words, "honest errors by the affiant are not grounds for suppression." *United States v. Sanchez*, 725 F.3d 1243, 1247 (10th Cir. 2013). The reviewing court will accept all factual allegations in the warrant affidavit as true, even if they are not, unless there is evidence that the affiant acted in bad faith or in reckless disregard for the truth. *Id.*

However, once a defendant effectively questions the validity of a search warrant by proving that an affidavit contains intentional or reckless misrepresentations, as is the case here, the magistrate judge who issued the warrant cannot be considered the primary protection of a citizen's Fourth Amendment rights. *See United States v. Campbell*, 603 F.3d 1218, 1228 (10th Cir. 2010) (explaining that the magistrate judge is the sole protection of a citizen's Fourth Amendment rights in cases where the police have "been merely negligent in checking or recording the facts relevant to a probable-cause determination"). It becomes the reviewing

court's responsibility to step into the magistrate judge's shoes and determine whether the excised affidavit supports a finding of probable cause.

Probable cause exists if "the facts presented in the [excised] affidavit would warrant a [person] of reasonable caution to believe that evidence of a crime will be found at the place to be searched." *United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1330 (10th Cir. 2003). In *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004), the Tenth Circuit provided an extensive discussion of the probable cause analysis, in which it emphasized that "no single factor is determinative" and a court must "view the circumstances in their totality rather than individually." *Id.* Thus:

> [C]ourts may not engage in a 'divide-and-conquer' analysis of facts to determine whether probable cause existed. . . . [N]either may a court arrive at probable cause simply by piling hunch upon hunch. . . . [I]n assessing the totality of the circumstances, a reviewing court must examine the facts individually in their context to determine whether rational inferences can be drawn from them that support a probable cause determination. A factor does not become irrelevant simply because it is readily susceptible to an innocent explanation. [The Court should consider] not only . . . the facts supporting probable cause, but also . . . those that militate against it.

*Id.* (internal citations omitted). Keeping these words in mind, the Court will address each of Defendant's contentions.

## DISCUSSION

### I.   Defendant's April 2011 Travel to Canada

In the MEMORANDUM OPINION AND ORDER (Doc. No. 39) denying Defendant's Motion to Suppress, the Court made the following factual finding, as part of its attempt to paraphrase the information contained in the warrant affidavit: "In April 2011, Defendant flew to

Canada without a return ticket and drove from Canada to the United States five days later."[7] In the exact words of the warrant affidavit: "The query documented that on 04/12/2011; ADAMS crossed the U.S. border via outbound commercial air to Calgary International Airport; Calgary, Alberta, Canada . . . without a corresponding inbound flight. The query documented that on 04/17/2011; ADAMS crossed the U.S. border via outbound commercial air to Calgary International Airport . . . with a corresponding inbound flight on 04/19/2011." WA ¶¶ 31-32.

Defendant now denies traveling to Canada on April 12, 2011 without a return ticket; he maintains that the Court must disregard this allegation because SA Ortiz should have known the information contained in the travel database was untrustworthy. Motion to Reconsider at 11. There are two problems with this argument. First, Defendant could have, but failed to raise an objection to this section of the warrant affidavit in the Motion to Suppress. *See Christy*, 739 F.3d at 539 ("A motion to reconsider should not be used to . . . advance arguments that could have been raised earlier.").

Second, and more significantly, the Court is not free to reject a factual allegation in the warrant affidavit merely because Defendant asserts, without supporting evidence, that this fact is incorrect. *See Franks*, 438 U.S. at 171 ("There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant."). Here, Defendant has not provided any evidence, in the form of an affidavit or testimony at any of the hearings, that Defendant did not travel to Canada without a return ticket on April 12, 2011. Instead, Defendant identifies a discrepancy between the Department of Homeland Security (DHS) record entry for Defendant's April 12, 2011 "trip," which Defendant denies taking, and the April 17, 2011 flight, which

---

[7] This sentence should have read: "In April 2011, Defendant flew to Canada without a return ticket and drove from Canada to the United States sometime within the next five days." However, Defendant does not challenge the Court's finding regarding when Defendant returned to the United States, and the exact date of his return had absolutely no influence on the Court's decision.

Defendant admits taking. The DHS record for the April 17, 2011 flight contains passport information, while the record for the April 12, 2011 flight does not. Based on this inconsistency, Defendant asks the Court to infer that Defendant must not have flown to Canada on April 12, 2011. Reply at 11. This is too great a conjecture. In the absence of any documentary evidence or testimony regarding the entry of passport information in the DHS database, the Court cannot simply assume there is some correlation or connection between the existence of passport information and accurate travel records.[8] Because Defendant has not produced evidence proving that the allegation concerning his April, 12 2011 travel to Canada was false, the Court will not excise this information from the warrant affidavit.

## II.      The Administrative Compliance Inspections

Defendant also challenges the Court's finding that Defendant was "uncooperative and evasive" during the 2006 and 2009 administrative inspections of his business. Motion to Reconsider at 12-13. The Court used the words "uncooperative and evasive" in order to characterize, in a concise manner, the cumulative import of the following facts, none of which Defendant denies: (1) prior to the 2006 inspection, Defendant told ATF inspectors that he was on vacation and asked to reschedule, WA ¶ 9; (2) prior to the 2009 inspection, Defendant once again told ATF inspectors that he was on vacation and asked to reschedule, WA ¶ 1; (3) in addition, immediately prior to the inspection scheduled in 2009, Defendant relinquished one of his three firearms licenses, WA ¶ 1; and (4) finally, at the 2009 inspection, Defendant denied having any firearms or doing business under his remaining licenses, even though he was actively advertising guns for sale on three websites: "www.adamsguns.com," "www.gunbroker.com," and "www.gunsamerica.com," WA ¶¶ 2, 8. These are the facts that impacted the Court's probable

---

[8] Similarly, a report indicating that DHS travel records "may not be accurate or timely because [they are] not collected directly from the individual," Reply at 10, does not prove that Defendant did not fly to Canada without a return ticket on April 12, 2011.

cause determination. Defendant has not disputed these facts; thus, there is no reason for the Court to alter its assessment of Defendant's behavior during the administrative inspections.

Defendant further disagrees with the Court's conclusion, lifted directly from the warrant affidavit, that Defendant was failing to maintain accurate records of his firearms transactions in 2009. Motion to Reconsider at 12-13. Defendant claims that the discrepancies between his 2006 and 2009 records, outlined in the warrant affidavit, were not suspicious and were the result of the instructions he received from a former ATF inspector. *Id.* Defendant's position is directly contradicted by the testimony of ATF Industry Operations Investigator (IOI) Theresa Duran. March Transcript at 72:2-21. While Defendant quarrels with IOI Duran's conclusion, he did not present evidence specifically controverting her sworn testimony. Nor did Defendant show that the problems with Defendant's recordkeeping identified by IOI Duran definitively resulted from Defendant's attempts to comply with ATF requirements. In fact, at least one of the recordkeeping issues discussed in the warrant affidavit cannot be explained away as the result of Defendant taking corrective action. According to warrant affidavit, in 2008, Defendant recorded the importation of eleven firearms in the book associated with his sole proprietorship, even though they were imported using Defendant's limited liability company license. WA ¶ 5. Because Defendant has failed to prove that the allegations concerning his inadequate recordkeeping were false, the Court will not exclude them from the warrant affidavit.

### III.   Bud Haynes & Company Shipment

#### a.   The Nature of the Court's Mistake

In the Motion to Suppress, Defendant argued that SA Ortiz intentionally and recklessly omitted material information from the warrant affidavit by failing to inform the magistrate judges that Defendant had obtained an approved Form 6 to import the firearms he purchased

from Bud Haynes & Company. Motion to Suppress at 25-26. The Government did not disagree with Defendant's description of the underlying facts, but responded that there was no *Franks* violation because information concerning the approved Form 6 was not omitted from the warrant affidavit or otherwise concealed from the magistrate judges. UNITED STATES'S AMENDED RESPONSE TO DEFENDANT ROBERT E. ADAMS' MOTION TO SUPPRESS EVIDENCE (Doc. No. 32 at 20-21). The Government highlighted paragraph 21 of the warrant affidavit, which states that in June 2012 the affiant learned that the Form 6 "executed and filed by ADAMS in relation to the firearms" purchased from Bud Haynes & Company had "a 1 year expiration date, invalidating the importation of these firearms into the United States." *Id.* Restated concisely, the warrant affidavit said that the Form 6 filed by Defendant had expired by June 2012.

The Court acknowledged that this section of the warrant affidavit was ambiguous and expressed sympathy with Defendant's position. *See* MEMORANDUM OPINION AND ORDER (Doc. No. 39 at 8). The warrant affidavit does not directly state that Defendant obtained a permit, an approved Form 6, associated with the Bud Haynes & Company shipment, and it does not describe the content of this permit. Instead, in order to interpret the warrant affidavit, the reader must notice the allegation in paragraph 21, discern its significance, and infer that Defendant had an approved Form 6 associated with the Bud Haynes & Company shipment. Nonetheless, despite this lack of clarity and conciseness, the Court concluded that information regarding the existence of the approved Form 6 for this shipment was not omitted from the warrant affidavit. *Id.* at 9. At that time, the Court was acting under the misapprehension that Defendant had only obtained approval to import part of the Bud Haynes & Company shipment. The Court believed Defendant had failed to obtain approval, using an ATF Form 6, to import 51 of the firearms in the shipment.

The Court based this conclusion on the warrant affidavit and the testimony of the affiant, SA Ortiz. Specifically, the warrant affidavit states that Defendant stored 132 of the 133 firearms he purchased from Bud Haynes & Company in a Canadian storage locker and that 51of these firearms were not listed on Defendant's ATF Form 6A. WA ¶¶ 39-40. Based on the testimony of the affiant and the supporting briefing, the Court interpreted paragraphs 39 and 40 of the warrant affidavit as making a claim that Defendant never received approval, using an ATF Form 6, to import the 51 firearms not listed on the Form 6A. *See* UNITED STATES'S AMENDED RESPONSE TO DEFENDANT ROBERT E. ADAMS' MOTION TO SUPPRESS EVIDENCE (Doc. No. 32 at 22) ("While it is true that some of the guns defendant Adams listed on his Form 6 'Request to Import Firearms' were recovered from the Canadian storage locker, as set forth in paragraph 39 of the affidavit in support of the search warrant[,] 51 firearms recovered from the Canadian storage locker were not listed on the Form 6."); March Transcript at 89:15-22, 164:3, 169:16-20 ("They seized 132 firearms from the locker . . . I'm sorry, 131. Some of these firearms were listed on the Form 6 that Defendant Adams had submitted, but some of them, I believe 51 of them, were not." "There were 51 that were not on the Form 6 application." Q:"So on the one hand, your affidavit suggests that all the firearms are there, and then in the next paragraph, it suggests that one is missing." A: "Yeah, all the firearms in the Form 6, but not the 51, those are missing from the Form 6 is what I said.").

The parties agree SA Ortiz testified inaccurately and that the Court was therefore mistaken. The warrant affidavit correctly states that Canadian law enforcement officials found "fifty-one (51) additional firearms . . . that were not listed on **ATF Form 6A**" (emphasis added) when they searched the storage locker where Defendant stored the Bud Haynes & Company

firearms. As it turns out, however, most of these 51 firearms were listed on an approved Form 6.[9]

In other words, the Form 6 and the Form 6A associated with the Bud Haynes & Company

shipment differ. This is not unusual. A Form 6 is simply an application submitted by an FFL to

obtain approval to import firearms into the United States. An FFL may submit a Form 6 prior to

the completion of a forthcoming firearms sale. Thus, if the sale disintegrates, in whole or in part,

the Form 6 will remain unused. An FFL does not complete the Form 6A, on the other hand, until

the time of importation. The purpose of the Form 6A is to describe the firearms actually

imported under an ATF Form 6 permit. [10]

Here, the warrant affidavit merely states that Defendant purchased 51 firearms from Bud

Haynes & Company that were not listed on an ATF Form 6A. Thus, the warrant affidavit does

not support the Court's finding that Defendant began the process of shipping 51 firearms into the

United States even though he did not have the necessary ATF approval to import these firearms.

This finding was both an inaccurate statement of the allegations in the warrant affidavit and an

inaccurate statement of what really happened.

Regrettably, the Court's misunderstanding of the facts was critical to the Court's analysis.

*See* MEMORANDUM OPINION AND ORDER (Doc. No. 39 at 18) ("[T]he Court considers

Defendant's behavior regarding the shipment from Bud Haynes & Company to be the most

---

[9] The parties agree that Defendant obtained the necessary ATF approval to import all but one of the 133
firearms purchased from Bud Haynes & Company. According to a table prepared by Defendant, he
obtained an approved Form 6 (Permit No. 10-06149) to import 122 of the 133 firearms. Of the remaining
eleven firearms, not listed on the Form 6, ten were antique firearms that can be imported without prior
ATF approval. As a result, only one firearm was missing from the Form 6 filed by Defendant.
TRANSCRIPT OF MAY 20, 2014 HEARING (Doc. No. 65 at 8:1-6, 16:5-15, 46:4-20).
[10] When it wrote the April 18, 2014 MEMORANDUM OPINION AND ORDER, The Court understood
the difference between a Form 6 and a Form 6A. However, the Court wrongly supposed that the Form 6
and the Form 6A submitted by Defendant listed the same firearms, when they did not. This confusion
arose because SA Ortiz and Mr. Cairns referred to the ATF Form 6 and the ATF Form 6A
interchangeably, and Defendant never directly attacked this error. Quite frankly, the warrant affidavit is
rife with drafting errors, and the Court originally assumed that the reference to the Form 6A in paragraph
39 was a typographical error and was intended to be Form 6.

significant. Defendant purchased firearms from a Canadian company for shipment to the United States, but did not seek approval to import the entire shipment. Instead, the shipment was diverted and placed in a storage locker in violation of Canadian law. This sequence of events strongly suggests that Defendant intended to clandestinely transport the 51 unapproved firearms into the United States."). Because the parties now agree that the Court misunderstood the facts surrounding the shipment from Bud Haynes & Company, the Court must reassess whether the excised warrant affidavit supports a finding of probable cause that Defendant was regularly engaged in firearms smuggling.

### b.  The Government's Position

According to the Government, the Court should reaffirm its prior decision because the Court reached the correct conclusion: Defendant intended to smuggle the 51 firearms described in paragraph 39 of the warrant affidavit.[11] To support this position, the Government outlines the facts and enumerates the process by which it believes Defendant was attempting to smuggle firearms into the country. The Government titles this section of its response: "Smuggling Guns by the Numbers." Briefly, the Government contends Defendant purchased firearms from Bud Haynes & Company, acquired a Form 6 permit because it was necessary to complete the sale, submitted a Form 6A for part of the shipment, which he intended to import legally, and then diverted the entire shipment into a storage locker. Based on these facts, the Government argues

---

[11] While the Government attempts to minimize the consequence of the Court's original misinterpretation of paragraph 39, *see* Response at 5 ("Defendant Adams would have the Court reverse its decision to deny the motion to suppress when the inaccuracy in the Court's finding can be cured by changing a single word and adding a single letter."), the Government acknowledges that its theory of the case completely differs from what the Court originally believed. The Court erroneously thought this was a simple case of an FFL purchasing firearms abroad and beginning the importation process without ATF approval. *See, e.g.*, *United States v. Douglas AD-4N Skyraider Aircraft*, 839 F. Supp. 2d 1243, 1250 (N.D. Ala. 2011) ("[T]he United States has made a more-than-sufficient showing of probable cause for forfeiture of [cannons and aircraft parts] on the ground that each was introduced into the United States 'contrary to law' because each was introduced into the United States without first obtaining the proper license or permit," *i.e.* an ATF Form 6.). The corrected facts show this is not the case.

that Defendant always intended to divide the shipment, legally import only part of the shipment, and smuggle the remainder.

All told, the Government's response succeeds in making this theory sound plausible. However, the strength of the Government's current allegations against Defendant is immaterial. It is not the Court's job to decide whether, considering all the facts now known, SA Ortiz could have drafted a warrant affidavit that supported a finding of probable cause. The question is whether the affidavit he submitted to the magistrate judges, without all of the intentional or reckless misrepresentations, would convince a reasonable person that Defendant was smuggling firearms. *See Garcia-Zambrano*, 530 F.3d at 1254. In disregard of this standard, the Government bolsters its position with facts that were not included in the warrant affidavit.[12] The following table is a comparison of the Government's argument with the actual information contained in the warrant affidavit.

| The Government's Argument (taken verbatim from the Response): | The Facts as Supported by the Warrant Affidavit: |
|---|---|
| Step One: Sometime in the five year period before 2011, defendant Adams purchased 133 firearms from Bud Haynes in Alberta, Canada. | According to the warrant affidavit, Canadian law enforcement officials seized 132 firearms from a Canadian storage locker rented by Defendant. A comparison of these firearms to a Bud Haynes & Company packing list showed one unaccounted for firearm. By implication, Defendant must have purchased 133 firearms from Bud Haynes & Company. While it seems reasonable to presume this sale occurred sometime between 2006 and 2011, the warrant affidavit never gives a sale date.[13] |
| Some of the 133 firearms defendant Adams planned to import lawfully and the rest he intended to smuggled into the United States. | This is not a factual statement; it is merely argument concerning how the Court should interpret the facts. Moreover, to the extent it is quasi-factual, there are no allegations in the |

---

[12] The Court notes that both parties have surfeited the Court with a myriad of information supplementing the warrant affidavit and have devoted a significant amount of time disputing these additional facts, which are not to be found in the warrant affidavit.

[13] However, the warrant affidavit indicates that Bud Haynes & Company shipped the firearms to Defendant in the spring of 2011. WA ¶ 40.

| | warrant affidavit concerning Defendant's intentions at the time of sale. |
|---|---|
| Many of the firearms purchased by defendant Adams are prohibited in Canada. In order for defendant Adams, Bud Haynes or Conway Freight to obtain an authorization to export firearms, especially the prohibited firearms, from Canada to the United States, defendant Adams has to have an approved ATF Form 6. Otherwise, the firearms he has purchased will not leave the auction house of the shipper. | The warrant affidavit does state that Defendant purchased 41 prohibited firearms from Bud Haynes & Company. However, it never explains why this matters. It is completely devoid of any factual allegations about the requirements for obtaining a Canadian export permit. In other words, there are no allegations in the warrant affidavit to support a finding that Defendant needed to file a Form 6 alerting the Government to the existence of the firearms he allegedly planned to smuggle into the country in order to trigger the release of these firearms from the shipper. |
| Step Two: Defendant Adams obtains an approved ATF Form 6 for 121 of the 133 firearms. He claims that eleven of 133 firearms are antiques, those manufactured before 1898, which do not require a Form 6. He also did not list one of the guns, which is not an antique, the Winchester Model 75, .22 caliber, rifle, serial number 47891 on the Form 6. Defendant Adams claims that this was an oversight, but there is an unknown significance attached to the Winchester.[14] | First, because the warrant affidavit does not provide a sale date, there is no indication that Defendant's submission of the ATF Form 6 is "step two" rather than "step one." Second, the warrant affidavit does not contain any allegations concerning the content of the ATF Form 6 associated with the Bud Haynes & Company firearms. The warrant affidavit merely informs the reader that Defendant had an ATF Form 6 associated with the Bud Haynes & Company shipment. |
| [The Winchester] is one of two guns defendant Adams smuggled immediately into the United States and which was found in his home and business. | There is, of course, no information in the warrant affidavit presaging what would be found in Defendant's home and business when the search warrant was executed. The Court must disregard the Government's arguments about the fruits of the search. |
| Step Three: Adams completes the first part of a Form 6A listing eighty of the firearms from the Canadian shipment. | Once again, the warrant does not support a finding that this was "step three." The warrant affidavit never states when the ATF Form 6A was completed or submitted to CBP. Additionally, the warrant affidavit never directly states that Defendant himself completed the ATF Form 6A. Finally, according to the numbers in the warrant affidavit, the ATF Form 6A contained a list of 81, not 80 firearms purchased from Bud Haynes & Company. |

---

[14] At the June 26, 2014 hearing the Government conceded that the Court should not consider any factual information about the Winchester, because this information was not included in the warrant affidavit.

| | |
|---|---|
| The ATF Form 6A (5330.3C) is a different document altogether from the Form 6. It is required for every importation of firearms, ammunition, and/or implements of war, with certain exceptions listed in 27 C.F.R. §§ 447 and 478. It has three sections . . . When completed by Customs and Border Protection (CBP), the Form 6A is, in essence, a receipt indicating that firearms that were approved for importation by ATF in the Form 6 were actually imported through a commercial port of entry or that a percentage of the originally approved firearms were imported. | The warrant affidavit references the Form 6 and the Form 6A, but it never directly explains the distinction between the forms or the purpose of each form. There are no allegations in the warrant affidavit about the normal process for completing an ATF Form 6A. |
| As required, Adams sent the Form 6A with Section I completed to Customs and Border Protection officials at the Port of Entry in Sweetgrass, Montana. | As previously stated, the warrant affidavit does not say that Defendant directly submitted the Form 6A to CBP. Moreover, the warrant affidavit does not indicate which sections of the form were filled in. This is not surprising as the warrant affidavit never mentions the three sections on a Form 6A and their various purposes. |
| The eighty firearms listed on the Form 6A are the firearms defendant Adams intends to import lawfully. The remaining fifty-one guns that were listed on the Form 6, but not on the Form 6A are the firearms that Adams intends to smuggle into the United States along with an unknown number of antique weapons which are not listed on either form. | This theory is not described in the warrant affidavit and is, in fact, directly contradicted by the allegations in paragraph 39 of the warrant affidavit, which states that Defendant "falsified ATF F6A, as he never intended to import the dozens of firearms he secreted into his Canadian Storage locker." In other words, SA Ortiz, a former ATF agent, believed Defendant intended to smuggle the 81 firearms listed on the Form 6A. The Government now contends just the opposite: Defendant intended to legally import these firearms, while smuggling the remaining 51. |
| Defendant Adams did not want to list the firearms that he intended to smuggle on the Form 6A because CBP is required to send a copy of the Form 6A, with Section II completed, to ATF and there would be a record of the importation. | See previous note about the lack of allegations concerning the Form 6A. |
| Step Four: Adams flies to Canada and takes possession of the 133 firearms from Conway Freight. Instead of driving immediately to a commercial port of entry, [Defendant] secrets [the firearms] in a Canadian storage locker in | According to the warrant affidavit, Defendant flew to Canada in April 2011 without a return ticket. He then returned to Canada by plane shortly thereafter. The Bud Haynes & Company firearms were later discovered in a |

| | |
|---|---|
| violation of Canadian law. | storage locker rented to Defendant. Thus, it is reasonable to infer that he placed the firearms in the storage locker. |
| [T]he Gevarm .22 caliber rifle and the mysterious Winchester, he smuggles immediately either using his forged Form 4457 or by FedExing them to himself. | There are no allegations in the warrant affidavit concerning the Winchester. As for the Gevarm, the warrant affidavit merely states that it was listed on the Bud Haynes & Company packing list, but was not recovered from the Canadian storage locker. One could plausibly infer it was smuggled, but there is no direct evidence in the warrant affidavit to support this finding. |
| When Canadian law enforcement officials raid the storage locker, they find 131 firearms. Detective John Fulton with the Calgary Police compares the firearms from the storage locker with the Form 6A that defendant Adams submitted to CBP, and finds that fifty-one of the guns in the storage locker are not listed on the Form 6A. Agent Ortiz compares the list of the seized firearms with the Form 6 that defendant originally submitted for ATF approval and finds that one gun is missing, the Gevarm. | A correct summary of the facts (as they appear in the warrant affidavit) would state: When Canadian law enforcement officials raid the storage locker, they find **[132]** firearms. Detective John Fulton with the Calgary Police compares the firearms from the storage locker with the Form 6A **[]**, and finds that fifty-one of the guns in the storage locker are not listed on the Form 6A. **[Detective Fulton informed SA Ortiz that a comparison of the firearms seized from the storage locker with the Bud Haynes & Company packing list reveals]** that one gun is missing, a Gevarm. |

As this review demonstrates, there are numerous discrepancies between the Government's present understanding of the case and the allegations contained in the warrant affidavit. This is unsurprising as it appears that SA Ortiz, the affiant, was confused about the importation process. At the March 14, 2014 hearing, SA Ortiz testified that a Form 6A is filed after the firearms are "physically present in the United States" and "the only thing [an FFL] would have with him [when he accompanies a firearms shipment across the border] would be a Form 6 which would not require a serial number at that point." March Transcript at 157:16-24. In other words, it appears that, as late as March 2014, SA Ortiz did not realize an FFL must complete the first part of the Form 6A in order to bring a shipment of firearms through CBP. This might elucidate why SA Ortiz confused the Form 6 and Form 6A and repeatedly testified

that he was not aware of a Form 6A associated with the Bud Haynes & Company shipment,[15] even though the Form 6A is discussed in the warrant affidavit. Taken as a whole, SA Ortiz's testimony suggests that he, like the Court, incorrectly thought this was a simple case of an FFL attempting to import firearms into the country without an approved ATF Form 6 permit.

As it turns out, the facts are much more complicated and the parties have devoted lots of paper and a generous portion of their time disputing the nuances of the importation process and the facts surrounding the shipment from Bud Haynes & Company. Having provided a thorough exegesis of the Government's version of the facts, the Court is cautiously optimistic that it can overlook any lingering factual disputes, which have largely centered on information that is not contained in the warrant affidavit. The Court must not consider this extraneous information, but must determine whether the excised warrant affidavit supports a finding of probable cause that Defendant was engaged in an ongoing smuggling operation.

    **c.  Excised Warrant Affidavit**

Below is a list of all of the information contained in the excised warrant affidavit that is arguably relevant to the question of whether there was probable cause to believe Defendant was engaged in an ongoing smuggling operation.

1. As of 2009, Defendant was failing to accurately record his firearms transactions as required by federal law. A comparison of Defendant's 2006 and 2009 business records revealed that Defendant had deleted and manipulated numerous entries between 2006 and 2009. WA ¶¶ 4-5.

2. During the 2006 and 2009 administrative inspections of his business, Defendant was evasive. On both occasions, he initially told ATF inspectors that he was on vacation and asked to reschedule. In 2009, he relinquished one of his three firearms licenses and denied having any firearms or doing any business under his remaining two licenses, although he was actively advertising guns for sale on three websites: "www.adamsguns.com," "www.gunbroker.com," and "www.gunsamerica.com." WA ¶¶ 1-2, 8-9.

---

[15] *See id.* at 163:13-22 ("I've never seen the Form 6A regarding that particular shipment.").

3. Defendant regularly advertised guns for sale as having no importer's marks. WA ¶ 44.

4. In May 2009, Defendant made two trips from Canada to the United States by automobile. WA ¶ 30.

5. On April 12, 2011, Defendant flew to Canada without a return ticket; while there is no record of his return, he flew to Canada again on April 17, 2011, indicating that he must have reentered the United States sometime between April 12, 2011 and April 17, 2011. WA ¶¶ 31-32.

6. Between 2008 and 2011, Defendant submitted 18 Form 6 applications to import firearms. One of these applications was withdrawn; one was approved unconditionally; two were approved conditionally; one was partially approved; one was approved with restrictions; five were disapproved or marked void; and seven lacked a status block. These are all the Form 6 applications ATF has on file for Defendant. Of these 18 Form 6 applications, 12 list the country of exportation as Canada. WA ¶ 13.

7. ATF provided SA Ortiz with a letter, written by ATF Firearms Explosives Service Division technician Michael J. Cooney, outlining various concerns based on Defendant's submission of ATF Form 6 applications for prohibited firearms and non-existent firearms. This letter was dated June 15, 2006. WA ¶ 41.

8. Defendant's business records indicate that he imported eleven firearms using his SW, LLC license on September 3, 2008. "The firearms that were imported in 2008 were not of record in the CBP Import query. Additional searches by CBP found an importation of firearms dated September 3, 2008 from London Armory to ADAMS INTERNATIONAL." WA ¶ 7.

9. CBP Supervisor Peter Fabian "had previously received a fax from Milarm Company Limited . . . advising CBP of firearms that were physically picked up in July of 2009 by Robert E. ADAMS and driven to the United States in his motor vehicle." WA ¶ 16.

10. Import documents show that "on or about February 4, 2011, entry number 328-7206094-5 arrived at the Albuquerque International Airport," listing Defendant as the Importer of Record. The shipment contained an invoice indicating that it involved firearms. WA ¶ 18. Furthermore, "[o]n February 4, 2011, Firearms Importation Document CBP Form 3461, Entry number 328-7206094-5, the listed Ultimate Consignee and the Importer of Record is listed as ADAMS INTERNATIONAL, 3200 Carlisle NE, Suite E, Albuquerque, NM 87110, wherein he imported items he describes as 'Sports Weapons' is contrary to and in violation of 18 USC § 923 (a)." WA ¶ 13.

11. Finally, in 2011, Bud Haynes & Company shipped Defendant 133 firearms,[16] for which Defendant executed and filed an ATF Form 6. WA ¶¶ 14, 16, 21, 33, 40. Although CBP forwarded SA Ortiz a copy of a Form 6A "by Robert E. ADAMS," the shipment never arrived at the Sweetgrass, Montana Port of Entry. WA ¶¶ 14, 17, 19-21, 33, 39. On August 15, 2011, CBP Trade Operations Chief Bob Brusven told SA Ortiz that "the firearms importation shipment may not have been allowed," based on suspicions of prior misconduct. WA ¶ 14. On July 27, 2012, Canadian law enforcement officials searched a Calgary, Alberta storage locker rented by Defendant and seized 132 of the 133 firearms that were purchased from Bud Haynes & Company, which were being stored in the locker in violation of Canadian law. WA ¶ 33. According to Canadian officials, Defendant had stored the firearms in the locker since September 2011. WA ¶ 21. The missing firearm was a GEVARM .22 LR caliber rifle. WA ¶ 40. A review of the Weapons Seizure list against the Form 6A showed that all the firearms listed on the 6A were recovered, as were 51 firearms not listed on the 6A. WA ¶ 39. In other words, only 81 of the 133 firearms purchased from Bud Haynes & Company were listed on the Form 6A. [17]

Notably, despite numerous opportunities to defend the warrant affidavit and the Court's

direct request for the Government to exhaustively identify the factors relevant to the probable

cause analysis, the Government has never discussed or even mentioned facts 7-10 as listed

---

[16] As previously mentioned, the warrant affidavit never directly states the number of firearms Defendant purchased from Bud Haynes & Company. According to paragraph 33, Canadian officials seized 132 firearms from a storage locker rented to Defendant. Much later, in Paragraph 40, the affiant explains that a law enforcement official compared the seized firearms against a packing list from Bud Haynes & Company and found that all but one of the firearms had been recovered. An observant reader could infer that Defendant must have purchased 133 firearms from Bud Haynes & Company.

[17] While the Court limits its attention to the factual allegations contained in the excised warrant affidavit, the Court notes that the briefing and testimony significantly aided the Court in understanding the affidavit and in distilling an intelligible recitation of the facts from the affidavit. Even the sections of the warrant affidavit that are technically accurate are poorly drafted and often bewildering. For example, after first reading the warrant affidavit, the Court was under the impression that ATF had approved the majority of Defendant's Form 6 applications. In other words, the Court did not notice that seven of the Form 6 summaries contained in the warrant affidavit are missing a status line until defense counsel brought this matter to the Court's attention. Similarly, the relationship between paragraphs 14 and 16 of the warrant affidavit is opaque. Paragraph 14 involves an August 2011 conversation regarding an unidentified shipment of firearms "destined for FFL ADAMS." Paragraph 16 involves a November 2011 conversation regarding the shipment from Bud Haynes & Company. As it turns out, the date in paragraph 16 is incorrect; the parties agree that this conversation occurred sometime prior to August 2011. *See* May Transcript at 57:8-60:14. Additionally, the parties agree that these paragraphs are both referring to the same shipment of firearms, the shipment from Bud Haynes & Company. *Id.* This is significant because paragraph 14 is the first time the warrant affidavit mentions the ATF Form 6A; it is also the only time the warrant affidavit mentions both the ATF Form 6 and the ATF Form 6A in close proximity. Yet, this paragraph does not make it clear that these forms are definitively associated with the Bud Haynes & Company shipment. It is unknown whether the magistrate judges who reviewed the warrant affidavit noticed these oddities, and if so, how they responded.

above. The Court interprets the Government's persistent silence as a concession that these allegations have no probative value and should not be considered as part of the probable cause analysis.

The Government's position is understandable; SA Ortiz "didn't keep anything out of the affidavit[,] . . .[but] put [in] everything that [he] knew about the case," March Transcript at 119:10-11, including rumors and unexplained occurrences. For example, as stated in fact 9 above, SA Ortiz reports that CBP Supervisor Fabian told him that an unidentified person at Milarm Company Limited, an organization about which there is no other information in the warrant affidavit, sent a fax claiming Defendant transported firearms into the United States by motor vehicle. This information is completely uncorroborated and there is no indication that the original, unidentified source of the information is trustworthy.

Similarly, fact 8 and fact 10 contain information suggesting Defendant *may* have imported firearms into the United States on September 3, 2008 and February 4, 2011. Yet, it is in no way clear from the affidavit that Defendant smuggled these firearms, rather than importing them openly and legally. While SA Ortiz intimates there may have been an irregularity with the February 2011 shipment, so that it was "contrary to and in violation of 18 USC § 923 (a)," the federal firearms licensing statute, this part of the affidavit is incomprehensible. The Court has no way of confirming SA Ortiz's legal assessment. In light of the Government's failure to address these allegations, the Court will limit its attention to facts 1-6, and 11 listed above.

### d.  Probable Cause Analysis

Once all of the extraneous information and argument is stripped away, the allegations on which the Government rests its case are meager. The Government asks this Court to believe that Defendant's "modus operandi" was to purchase firearms abroad with an approved ATF Form 6,

divide the shipments, import some legally, presumably to shield himself from ATF scrutiny, and smuggle the rest. However, the warrant affidavit contains no tangible, concrete evidence from which a person could draw a reasonable inference that Defendant perpetrated this type of scheme on more than one occasion. To the contrary, the Government argues that Defendant never legally imported any firearms since roughly 2007 or 2008. *See* UNITED STATES'S AMENDED RESPONSE TO DEFENDANT ROBERT E. ADAMS' MOTION TO SUPPRESS EVIDENCE (Doc. No. 32 at 2, 8); March Transcript at 86:7-87:2; WA ¶¶ 7, 12. If it was Defendant's "modus operandi" to buy firearms, legally import some, and smuggle the others, the Court would expect that Defendant would have imported firearms, through the proper legal channels, sometime in the past five years.

The only allegations in the warrant affidavit which directly support the Government's theory are those concerning the Bud Haynes & Company shipment, which is the lynchpin of the case against the Defendant. While these allegations are confusingly delineated, the Government's argument is, at heart, fairly simple: the only reason for Defendant to not list 51 of the 133 firearms purchased from Bud Haynes & Company on the ATF Form 6A and then to store these firearms in a storage locker, in violation of Canadian law,[18] was to further his attempt to smuggle these firearms into the United States. *See* Response at 12-13 ("Moreover, there is no reason for defendant Adams to have not listed them on the Form 6A or to secret them in storage locker in violation of Canadian law. The only explanation for all of these events is that defendant Adams intended to smuggle the firearms into the United States.").

After carefully ruminating on the allegations in the warrant affidavit, the Court is not comfortable drawing any inference about Defendant's intent from the barebones allegations

---

[18] The Government never attempts to explain why Defendant placed the entire shipment, including the 81 firearms the Government claims Defendant planned on legally importing, in a storage locker in violation of Canadian law.

about the Form 6A. In other words, the Court finds that the excised warrant affidavit does not support an inference that Defendant intended to smuggle the 51 firearms omitted from the Form 6A. In weighing whether this was the right determination, the Court repeatedly returned to the complexity of the firearms importation process. The experience and knowledge of the average person does not encompass the steps an FFL must take when shipping firearms through CBP. Without the help of an expert, a magistrate judge would not know whether irregularities in a Form 6A are common or are instead indicative of criminal behavior. Stated differently, without the expert opinion of an affiant familiar with the firearms importation process, a judge would have no way of knowing whether it was suspicious that Defendant submitted an ATF Form 6A, at some unidentified point in time, listing only 81 of the 133 firearms Defendant purchased from Bud Haynes & Company.

In short, the reference to the Form 6A contained in the warrant affidavit is a cipher. The warrant affidavit never clearly explains the difference between and the purposes of the ATF Form 6 and the ATF Form 6A. The warrant affidavit does not inform the magistrate judge that (1) an ATF Form 6A must be submitted to CBP before CBP will release a shipment of firearms into the country, *see* ATF Form 6A, Exhibit 3 to Response (Doc. No. 57-3); (2) CBP generally reviews each shipment against the Form 6A, May Transcript at 13:10-17, 50:4-10; (3) FFLs normally submit the Form 6A to CBP the same day a shipment is crossing the border, but these forms are occasionally submitted in advance, May Transcript at 52:7-12; and (4) the Form 6A is not signed and executed by the FFL until after the shipment is released into the possession of the FFL within the United States, *id.* at 14:17-23. SA Ortiz, the agent whose expertise the magistrate judges relied upon, never made any allegations in the warrant affidavit expounding the importance and use of the Form 6A, and it is now apparent that SA Ortiz lacks the necessary

experience with the importation process to make these allegations. The Court considers the warrant affidavit's failure to provide such opinion testimony critical. Unfortunately for the Government, the factual allegations contained in the warrant affidavit do not counterbalance this deficiency.

There are simply too many missing pieces for the Court to create a coherent, or even semi-coherent, picture of criminal activity. For example, the warrant affidavit does not state when Defendant (or his agent) submitted the Form 6A to CBP, nor does it otherwise indicate whether the Form 6A was submitted before or after Defendant finalized his purchase and Bud Haynes & Company shipped the firearms.[19] All the warrant affidavit reveals is that the Form 6A was in the possession of CBP by August 15, 2011. If Defendant had submitted the Form 6A before he finalized his purchase, there could be a completely obvious and innocent explanation for the omission of the firearms.[20]

Similarly, the warrant affidavit does not contain any factual allegations indicating when or why Defendant came to be in possession of the 133 firearms purchased from Bud Haynes & Company. Unless the magistrate judge sorted through the mix of allegations and noted and gave credence to the suggestion that Defendant's proposed shipment may have been rejected by CBP, it would have been completely mysterious why Defendant placed the entire shipment, including the 81 guns the Government now claims Defendant planned to legally import, in a storage locker in violation of Canadian law. However, because the warrant affidavit indicates that Defendant's

---

[19] In fact, the warrant affidavit never directly alleges that Defendant, and not some other party submitted the Form 6A. The Court is merely inferring that this is so because SA Ortiz once refers to "the ATF Form 6A Release and Receipt of Imported Firearms, Ammunition and Implements of War by Robert E. ADAMS under his FFL No. 5-85-001-08-3K-00983, listed as SW LLC, P.O. Box 3005, Albuquerque, NM 87190." WA ¶ 39.

[20] This does not appear to be what happened, but the magistrate judges would certainly have no way of knowing this.

shipment may have been rejected by CBP, the Court cannot infer that Defendant's decision to place these firearms in a storage locker was, in itself, suspicious.

To summarize, there is basically no information in the excised warrant affidavit indicating that Defendant's omission of the 51 firearms from the ATF Form 6A was underhanded or otherwise consistent with a smuggling enterprise. To the contrary, the facts as outlined in the warrant affidavit militate against a finding that Defendant intended to clandestinely transport these firearms into the country: according to the excised warrant affidavit, Defendant placed the entire shipment of firearms purchased from Bud Haynes & Company, including the 51 firearms omitted from the Form 6A, in a storage locker in his name in September 2011 and left them there until Canadian officials seized them in July of 2012. In other words, despite ample opportunity to do so, Defendant never actually smuggled the unlisted 51 firearms across the border. If, as the Government maintains, Defendant always, from the moment of purchase, intended to smuggle these firearms, he presumably had a plan for transporting the firearms into the United States. Yet, in the more than ten month period in which the firearms sat in the storage locker, Defendant never executed this plan, with the possible exception of the missing Gevarm.

However, this one missing firearm does not an ongoing smuggling operation make and cannot support the search and seizure of all of Defendant's firearms.[21] It may be reasonable to infer that an FFL who sells firearms without importer's marks, travels to Canada, has a history of recordkeeping violations, and has been caught attempting to smuggle 51 firearms into the

---

[21] Given Defendant's April 2011 travel to Canada, a reasonable person could conclude there was probable cause to believe Defendant smuggled the Gevarm into the country. But the Government did not seek a search warrant for this Gevarm alone. It sought and obtained a search warrant for smuggled firearms generally. As discussed in the last MEMORANDUM OPINION AND ORDER (Doc. No. 39), to support the seizure of all firearms smuggled into the country, the warrant affidavit must support a finding that Defendant was regularly engaged in firearms smuggling.

country is engaged in an ongoing smuggling operation. However, the same cannot be said of Defendant Adams merely because he had a contentious relationship with ATF and one firearm in his possibly-rejected shipment went missing. There are too many unknowns. For example: Was the packing list from Bud Haynes & Company accurate? Why did Defendant fail to import the 81 firearms listed on the Form 6A? Why did Defendant abandon the Bud Haynes & Company shipment in a storage locker? Was there some special significance attached to the Gevarm that would explain its disappearance? Given the numerous alternative explanations of what may have happened, the Court cannot rationally infer that Defendant was a regular firearms smuggler. Unlike a plan to smuggle 51 firearms, the one missing firearm does not suggest Defendant is a sophisticated criminal, engaged in regular firearms smuggling. In making this determination, the Court finds it significant that Defendant only traveled to Canada on two occasions in the last 12 years (in March 2009 and in April 2011). This is not consistent with the Government's position that Defendant was regularly smuggling firearms from Canada into the United States.

Throughout this analysis, the Court has continually kept in mind the background facts, which form the context of the investigation of Defendant: Defendant had a history of recordkeeping violations, he advertised firearms for sale as not having importer's marks, and Defendant submitted 18 Form 6 applications to import firearms between 2008 and 2011. Nonetheless, these facts do not significantly weight the probable cause analysis in favor of the Government. The Court has already explained why it does not consider Defendant's submission of Form 6 applications to be suspicious. *See* MEMORANDUM OPINION AND ORDER (Doc. No. 39) at 16-17.[22] Defendant's recordkeeping failures predate the Bud Haynes & Company shipment by almost two years and are not obviously or directly connected with any importation

---

[22] In its effort to defend the warrant affidavit, the Government continues to assert that Defendant's failure to import firearms despite his submission of numerous ATF Form 6 applications is suspect. *See* UNITED

activities. Finally, selling firearms without importer's marks is perfectly legal. These facts may have raised ATF suspicions, but they do not fit together, with the information about the Bud Haynes & Company shipment, to form a picture from which the Court can rationally infer Defendant was regularly engaged in firearms smuggling. To do so would simply be to pile hunch upon hunch. *See Valenzuela*, 365 F.3d at 897.

## IV.     Suppression

Because the Court concludes the excised warrant affidavit does not support a finding of probable cause that Defendant was engaged in an ongoing smuggling operation, the Court must suppress the evidence seized under the search warrants. Even though the warrant affidavit may support a finding of probable cause that Defendant smuggled the GEVARM .22 LR rifle into the United States, it is clear that this part of the warrant affidavit cannot be meaningfully severed from the invalid sections of the warrant affidavit. *See United States v. Sells*, 463 F.3d 1148, 1155, 1158 (10th Cir. 2006) (explaining that a court may not sever the invalid sections unless the valid sections are distinguishable and, taken together, make up the majority of the affidavit).

IT IS THEREFORE ORDERED THAT:

---

STATES' SUPPLEMENTAL BRIEF REGARDING DEFENDANT ROBERT E. ADAMS' MOTION TO RECONSIDER THE ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE, OR, IN THE ALTERNATIVE TO HOLD A FRANKS HEARING (Doc. No. 69 at 6). In so doing, the Government quibbles with the Court's decision to refuse to credit SA Ortiz's testimony that the seven Form 6 applications listed in the warrant affidavit without an accompanying status line were approved by ATF. As the Government notes, it has since provided the Court with copies of these forms, proving that they were in fact approved. This does not in any way undermine the Court's analysis. First, as the Court previously explained, there is nothing in the warrant affidavit, which it is this Court's job to review, indicating that the Form 6 applications lacking a status line are valid. *See* MEMORANDUM OPINION AND ORDER (Doc. No. 39 at 14). In its first opinion, the Court addressed SA Ortiz's testimony primarily to give context and to illustrate how little SA Ortiz understood the importation process. The Government candidly admits SA Ortiz inaccurately testified that the seven Form 6 applications were missing a status block. May Transcript at 30:4-10.

1.   DEFENDANT ROBERT E. ADAMS' MOTION TO RECONSIDER THE ORDER

DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OR, IN THE

ALTERNATIVE, TO HOLD A FRANKS HEARING (Doc. No. 48) is GRANTED.

2.   All evidence obtained through the execution of the various search and seizure

warrants based on the warrant affidavit drafted by SA Ortiz in January 2013 are

suppressed.


_____

SENIOR UNITED STATES DISTRICT JUDGE